## YMCA of Pittsburgh Appeal

*Nathaniel K. Beck* and *Philip Baskin,* county solicitor, and *John G. Brosky,* assistant county solicitor, for appellant.

*Moorhead & Knox,* for appellee.

MONTGOMERY, J., November 29, 1954.—The basic question presented to this court for determination is

whether, under the facts and circumstances of the instant case, appellant is subject to taxation on such parts of its buildings devoted to the maintenance of dormitory and food service facilities, operated primarily for the benefit of young men of low incomes, who are required to contribute to the cost of such facilities.

Since in Pennsylvania all tax exemptions must be traceable to a statutory origin, it is necessary to review the statutes which provide for exemption from taxation and the principles of law enunciated by the Supreme Court in determining what constitutes a "charity".

Exemption from taxation in the instant case must be predicated upon the Constitution of the Commonwealth of Pennsylvania and the General County Assessment Law.

Article IX, sec. 1, of the Pennsylvania Constitution provides as follows:

"All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws; but the General Assembly may, by general laws, exempt from taxation public property used for public purposes, actual places of religious worship, places of burial not used or held for private or corporate profit, *institutions of purely public charity*, and real and personal property owned, occupied, and used by any branch, post, or camp of honorably discharged soldiers, sailors, and marines."

The General County Assessment Law of May 22, 1933, P. L. 853, sec. 204, 72 PS §5020-204, as amended by the Act of May 3, 1943, P. L. 158, provides, inter alia, as follows:

"The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:

"(a) All churches, meeting houses or other regular places of stated worship, with the ground thereto annexed necessary for the occupancy and enjoyment of the same; . . .

"(c) All . . . *institutions of learning, benevolence, or charity, with the grounds thereto annexed* and *necessary for the occupancy and enjoyment of the same,* founded, endowed, and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, and the repair and the necessary increase of grounds and buildings thereof, and for no other purpose;

"(1) . . . Except as otherwise provided . . . all property, real or personal, other than that which is in actual use and occupation for the purposes specified in this section, and all such property from which any income or revenue is derived, other than from recipients of the bounty of the institution or charity, shall be subject to taxation, . . ."

The precise question, therefore, is whether or not the dormitories and food service were used for, and were necessary to, the purposes of the charity or whether their operation was not included in the charitable purposes of the association but was an enterprise for profit. Although the appellant is concededly an institution of benevolence and charity it is contended by the board that the dormitories and food service facilities maintained by the association are not so clearly "necessary for the occupancy and enjoyment" of the parts of the buildings devoted to appellant's work of charity as to entitle it to exemption from paying taxes on such dormitories and food service facilities. Because the young men who reside in the various branches of the association here in question are required to make some payment for dormitory facilities and food service in the cafeterias, it is argued

that these activities are not charitable but rather constitute a commercial enterprise.

In support of its position respondent relies chiefly on the case of YMCA of Germantown v. Philadelphia, 323 Pa. 401 (1937), while appellant claims the instant controversy is more properly governed by the decision in Salvation Army v. Allegheny County, 367 Pa. 373 (1951).

In the former case the court concluded that the Young Men's Christian Association of Germantown was not exempt from taxation on the part of its building used to maintain rooms for members. The exhaustive analysis made there by Mr. Justice Maxey of the principles of law governing exemption from taxation of charitable institutions resulted in the following conclusions:

1. The claimant of exemption from taxation must show affirmative legislation in support of his claim, and his case must fall clearly within it.

2. There must be facts which would justify a finding that the "actual use and occupation" of the premises is primarily for the designated charitable object and not largely for commercial purposes.

3. As a prerequisite to taxation exemption of an institution claiming to be benevolent or charitable, the portion of its property in respect to which exemption is claimed must possess an eleemosynary characteristic not possessed by institutions or property devoted to private gain or profit. What is "given" must be more clearly gratuitous than for a price which impresses one as being proportionate to the services rendered.

4. In the construction of the statute exempting from taxation institutions of purely public charity, exemption does not result from the fact that profits realized in what may be considered the "business activity" of the institution are devoted to its charitable purposes. In other words, property which is not used

directly for the purposes and in the operation of the charity, but for profit, is not exempt and this is true even though the profit of the business activity of the institution is wholly devoted to its charitable purposes.

The court further pointed out that the characteristics of an organized charity are: (1) Whatever it does for others is done free of charge, or at least so nearly free of charge as to make the charges nominal or negligible; (2) those to whom it renders help or service are those who are unable to provide themselves with what the institution provides for them, that is, they are the legitimate subjects of charity.

These criteria, which constitute the test of whether or not an institution is entitled to a charitable exemption from taxation on its properties, are quoted with approval in the Salvation Army case. The court there, speaking through Mr. Justice Drew, reaffirmed the applicability of these standards, but, in reaching an opposite conclusion on the issue of taxability, demonstrated the basic flexibility of such standards in the face of a similar but nevertheless varying factual situation.

The principal issue in both the Germantown case and the Salvation Army case was whether the renting of dormitory rooms was fundamentally a commercial enterprise. In the former decision the court held that the part of the building occupied by dormitory facilities was primarily commercial in nature, competing with lodging houses which were avowedly commercial. That the institution was admittedly one of benevolence and charity and the environment religious and morally uplifting did not alter the fact that the renting of its rooms was substantially like the renting of rooms of other lodging houses. The fact that the income of the dormitory facilities was devoted to the furtherance of the charitable aims of the organization was held immaterial, and hence the dormitory rooms,

which were rented on a commercial basis, were deemed subject to taxation.

Reaching the opposite result on the question of taxability the court in the Salvation Army case held that the renting of rooms to young women was not, under the facts presented there, a basically commercial transaction. In distinguishing the Germantown case the court, applying the same test set forth in that decision, gave further indications of the limitations of the test and also recognized that each such case is determined largely by the cumulative effect of all its facts. Therefore, in determining if the present controversy properly falls within the holding of either of the above cases, a comparison of the salient factors involved in each is desirable.

It is the opinion of this court that there are fundamental and material distinctions between the present case and the Germantown case, and that the evidence in the instant controversy more clearly warrants conformity to the holding in the Salvation Army case. In the Germantown case the Supreme Court said that the part of the YMCA building containing the lodging facilities was commercial in character because "it competes with lodging houses which are avowedly commercial in character". In neither the Salvation Army case nor the instant case was there any testimony of that character; in fact, the evidence shows that there was no advertising of the dormitory facilities in any of the five buildings here involved, and no complaints were heard from hotels or boarding houses that the dormitories were in competition with them. There was no proof furnished on this point in the Germantown case. Instead of competing with hotels, the Pittsburgh YMCA accepts a class of society which cannot afford hotels.

The Supreme Court in the Salvation Army case referred to another feature which distinguished it from

the Germantown case in pointing out that in the latter any man could walk in off the street and rent a room for the night. Because there was no limitation on admission to membership in the YMCA there, one in applying for a room could, for a nominal sum, obtain membership and then, for a substantial price obtain lodging. In the former case rooms were not rented to transients and the women lived in the Evangeline Residence as in a home, on a relatively permanent basis. Also, an applicant for a room in the Salvation Army home had to meet four qualifications for admission: (1) Must be a female under 35 years of age; (2) must not have more than a modest income; (3) must be from outside the city or from a broken home within the city, and (4) must be of good moral character. The court in deciding the Salvation Army case felt that a commercial establishment would have no such entrance qualifications.

The facts of the instant case clearly indicate that the policy and practice of the association in respect to the admission of permanent residents was similar to that adopted by the Salvation Army and was also entirely inconsistent with a commercial operation. The evidence reveals that a selective process was used for the admission of such permanent residents, giving preference to young men away from home of low incomes. The applicant was required to have an interview with a member of the staff. He had to take a physical examination and sign an application which, in addition to personal data, called for an indication of the program activities in which he was interested. Inquiry was made as to his income; character references were required. He was furnished with a folder emphasizing the purposes of the YMCA, participation in its activities and calling attention to churches in the neighborhood.

Although this policy may not have been absolutely enforced, and although it may have been *possible* for a person not meeting the above qualifications to be accepted for residence, the *actual* operation demonstrates that those accepted and residing in the various branches substantially met the announced requirements. The men *actually* accepted were in a low income group. In 1942 at the downtown branch, the average monthly income was $110 and the yearly income limit was $2,400, and at the East Liberty branch the average monthly income in said year was $170. Preference was given to young men, for, while the evidence shows that in 1942 in the downtown branch the average age was 35 years and in the East Liberty branch 30 years, it must be remembered that 1942 was a war year and that the ages were abnormally high because the younger men were being called for military service. It was established in the testimony that in 1937 a study made at that time showed that 73 percent of the occupants in the downtown branch dormitories were under 30 years of age. Also, the testimony disclosed that a majority of the occupants of the dormitory in the downtown branch came from out of the city, mostly from small towns in western Pennsylvania. There was no evidence of such a policy and practice in the Germantown case.

Therefore, the only notable difference between the facts of the instant case and the Salvation Army case is that here the association would rent rooms to men classified as transients. Under the practice followed by the association in 1942, dormitory residents were classified as permanent or transient. The permanent classification included all those who occupied the rooms for two weeks or more and paid rent on a weekly basis; transients being those whose occupancy was less than two weeks and who paid on a daily basis. All residents came in on the transient basis and continued on this

basis until their qualification and acceptance as permanent residents. Hence, transients obtained lodging without meeting the qualifications imposed by the policy and practice of the association on applicants for permanent residence. However, a great majority of the resident members in the five branches were in 1942 in the permanent category. At the downtown branch the total bed-night occupancy was 121,279. Of this number, 36,198 were in the transient classification. 24,399 of the bed-nights in the latter classification were taken by Navy and Marine recruits and men of the armed forces in uniform, leaving 11,800 bed-nights, or only about nine percent of the total taken by other transients, being members of other YMCA's and other men staying less than two weeks. The percentage of transients in the Allegheny branch was about nine percent; in the Centre Avenue branch about 17 percent and in the South Hills branch about five percent.

While no figures are available it is likely that in 1942 some portion of the transient occupancy at the Centre Avenue branch was attributable to men in uniform. At the East Liberty branch the figures showed about 39 percent transients, but here too a large percentage of the transient occupancy was taken by men in uniform. It is also important to note that residents were registered in the transient classification until their acceptance as permanent residents, and it might be one, two, or three days before they were accepted as permanent residents. There were, therefore, a considerable number of transient bed-nights attributable to men who later became permanent residents.

It is apparent then that the overwhelming majority of residents of the five branches here in question were of the permanent classification and had to meet the application requirements referred to above. Certainly

then, the mere fact that it was *possible* for "a man of mature years and wealth to rent a room for a single night" should not in itself turn the tables of taxability where the evidence clearly evinces that, as a *practical* matter, the dormitories here involved are open only to a special class of society which is in need of charitable assistance; namely, young men of low incomes away from home.

A comparison of the rates charged for dormitory rooms further supports this court's refusal to determine the instant controversy by application of the holding in the Germantown case. There, the rates, which averaged between $5.00 and $5.50 weekly, were comparable to the rates of the Downtown and Allegheny branches and were higher than the 1942 rates at the East Liberty, Centre Avenue and South Hills branches. This is true although the year involved in the Germantown case was 1934, while we are here dealing with 1942 when the dollar had declined considerably in value. Taking into consideration this decline, it is fair to say that the rates charged by the various branches of the association on the basis of the 1942 dollar were substantially lower than the Germantown rates. In fact, the rates here for 1942 compare favorably with those charged in the Salvation Army case which the Supreme Court considered nominal. Further, in the Germantown case it expressly appeared that the rates exceeded those charged by boarding houses in the vicinity, while in the present case the rates charged by the Downtown branch and other branches were much lower than those charged at downtown hotels, which in 1942 averaged between $2.50 to $7 per night.

In the Germantown case an extra charge was made for the use of all facilities, except the swimming pool. In the instant case as well as in the Salvation Army case no extra charge was made for the use of the gym-

nasium, swimming pool and numerous other facilities such as play rooms, lounges, etc. The membership charge included in the rental charge here entitled the resident members to all the rights and privileges of other members.

In the Germantown case the Supreme Court said that from the accounts in evidence it was impossible to determine whether or not the operation of the dormitory resulted in a net profit. The court further said there was no proof that the lodging was furnished by the plaintiff association at less than actual cost; there was no showing that the expenditures in maintaining the lodging exceeded the gross receipts thereof. In the Salvation Army case the evidence established the fact that the Evangeline Residence had been operated at a substantial deficit each year. By applying the same principles of accounting in the instant case, the evidence clearly establishes that the operation of the dormitories resulted in a net annual loss.

There was no evidence in the Germantown case in respect to the physical characteristics of the rooms and the type of accommodations furnished. Here, as in the Salvation Army case, the evidence was ample in showing that the rooms from this standpoint were not designed to compete with hotels or to furnish the same type of accommodations.

In the Germantown case the Supreme Court held that the appellant had failed to prove that the use of the dormitory was "primarily for the designated charitable object and not largely for commercial purposes". In the instant case the evidence establishes the fact that all of the buildings of the various branches were used directly to further the religious and charitable purposes of the association which included the drawing within the orbit of its influence and program, a group of persons peculiarly in need

of such services, namely, young men of small incomes away from home coming to Pittsburgh to find jobs and go to work in the Pittsburgh district.

Having thus distinguished the Germantown case from the one now before this court, further consideration of the evidence adduced by the appellant here leads to the conclusion that the legal requirements declared by the Supreme Court in that case to govern exemptions from taxation have been conclusively fulfilled. The five buildings involved in these appeals are standard type of YMCA buildings, dormitories having been operated in all of these buildings since their erection. The association is a member of the National Council of Young Men's Christian Associations, said council being the representative body of the associations of the United States. The council has encouraged as a national policy the furnishing of housing facilities for young men away from home. The public contributed all the funds required to purchase the land and to erect the buildings here involved. In securing funds from the public for the erection of the five branch buildings, the provision of dormitory facilities as part of the program of the association was used as a selling point. The Board of Directors incorporated dormitories in the buildings, believing that they were necessary and desirable in carrying out the charter purposes of the association.

There are many facts and circumstances indicating that the dormitories were not operated on a commercial basis for profit. The average size of the dormitory rooms in the various branches was 9 x 10½ feet. The rooms contained a minimum of furniture: a bed, table, and chair. There were no baths or running water, no telephone or porter service and one washroom on each floor was provided for all the occupants of that floor. The foregoing description tallies quite closely with the size of rooms, equipment and service

facilities in the Salvation Army case, except that the rooms in the Evangeline Residence there had running water. Obviously, such simple facilities are not designed to compete with hotels or other commercial establishments.

The selective process previously described and used for the admission of permanent residents, giving preference to young men away from home of low incomes, was also inconsistent with a commercial enterprise.

The rates charged both permanent and transient residents in the five branches in 1942 were very moderate, being much less than would have been charged had the purpose of the association been to operate the dormitories for profit. At the Downtown branch, the average weekly bed rate for permanent residents was $6.58, including 50 cents per week for membership, or $5.92 per week if advantage were taken of the 10 percent discount granted for payment of rent in advance. The average weekly rate at the Allegheny branch was $5.54 per week, including 50 cents per week for membership; at the East Liberty branch $4.84 per week, including 35 cents per week membership; at the Centre Avenue branch $3.64 per week, plus a $5 annual membership fee; at the South Hills branch $4.06 per week, including 50 cents for membership. The record in the Salvation Army case shows that the average room rate per week in 1942 was $4.69, which was higher than the average for said year in the Centre Avenue branch and South Hills branch.

In 1942 the dormitories of the Downtown, Allegheny and East Liberty branches were used extensively by military personnel, including inductees, men in uniform and trainees at the Keystone Schools for the United States Signal Corps. The charge at the Downtown branch for inductees and men in uniform

was 75 cents a night and the charge at the East Liberty branch was the same. The charge for the trainees at the Allegheny branch was $13 a week, allocated $4.25 to lodging and $8.75 for board. Such a nominal charge for this valuable service further negatives the idea of commercial enterprise. Also free lodging and food was provided in 1942 for 215 young men at the Downtown branch.

In addition to the lodging furnished, the amounts paid by residents entitled them to many other facilities such as the gymnasium, swimming pool and the opportunity to attend religious services and other program activities. The young men were recipients of many kinds of services, such as help in finding jobs, counseling and guidance, special religious, athletic and social activities, entertainments organized for their benefit and help in making church contacts. Such facilities and services are not provided by commercial establishments, but rather constitute the elements of a home. These facilities and services and the extensive use of them by the resident members demonstrate that the association, in providing lodging, was carrying out its avowed purpose that the dormitories should be a "home away from home" for the young men who reside there.

Further, the evidence shows that the appellant operated the branches at an annual deficit, made up each year by contributions from the local Community Chest. By making proper charges for noncash items of cost such as depreciation and rent the deficits become several times greater. In comparison, the record in the Salvation Army case reveals that in many of the years involved in that case there would have been a substantial profit from the rooms without the benefit of items of depreciation and interest on investment. Specifically, in 1940, 1941 and 1942, the profit would have been $10,935, $10,670 and $9,252, respectively.

The cumulative effect of the evidence presented in this case demands the conclusion that the dormitories were not in 1942 operated on a commercial basis for profit, but were directly connected with and reasonably necessary to the charitable purposes of appellant.

In determining whether or not the food service facilities of the appellant's branches are subject to taxation, exactly the same principles of law are applicable. The question again is whether the facilities are "necessary" to the operation of the institution in achieving its charitable purposes. This court is convinced that such food service facilities are an integral part of the Association's charitable aim of providing a "home away from home" for young men of low incomes. The food service facilities in the Downtown and Allegheny branches have been operated since the erection of the buildings in 1924 and 1928, respectively; and in the East Liberty and Centre Avenue branches since about 1938.

The testimony is uncontradicted in showing that the principal purpose of the food service was service to residents and members. It was of great value in planning the work of the YMCA in that it enabled large groups of volunteer workers serving on essential committees to meet and confer at lunch and dinner hours, thus saving time. The various club organizations promoting the work of the association were aided inestimably by being able to build their program around a noon luncheon or evening dinner. Food service was particularly necessary in the Downtown branch because of its large membership of 6,600 in 1942 and because many of its members worked in the downtown district and were able at the noon hour to combine a meal with participation in program activities.

Although the testimony revealed that the general public was not excluded, the great majority of persons

using the food service in the four branches were general members, resident members, and their friends. Also, there was no advertising of the food service in any of the branches, nor was any complaint ever received that the service was in competition with local commercial establishments. And, there was no attempt made by the association to stimulate use by non-members. The food service facilities could not be entered directly from the street nor even observed from the street.

Without question the rates for food service were moderate and even nominal as evidenced by the fact that the average income per meal in 1942 was only 34 cents. The facts indicate that the operation of the food service resulted in substantial losses in 1940, 1941 and 1942 when overhead, depreciation, and interest on investment are considered.

In the Germantown case there was no question as to the taxability of the portion of the property devoted to a kitchen and lunch counter. However, the principles of law relating to tax exemptions for such institutions are still applicable. Whether or not the food service facilities are reasonably "necessary" to the purposes of the charity is still the pivotal question. Certainly, a facility which provides residents and members wholesome meals at a moderate price is a necessary feature of a home. As with the dormitories, in policy and in effect the facilities are used only by residents and members of the association. That a small percentage of their use may be attributed to the general public is only indicative of a failure on the part of the association to maintain what might be a cumbersome system of screening or supervision, not warranted when such use appears negligible and only incidental. As a *practical* matter, the food service facilities are used primarily for the benefit of residents and members in drawing these young men to-

gether in a homelike atmosphere where they are more responsive to the uplifting physical and spiritual influences of the association.

The words of the court in YMCA v. City of Easton et al., 3 D. & C. 562, 564, as quoted in plaintiff's brief, are particularly appropriate:

"With respect to the cafeteria, it was contended that as the public were allowed to use the cafeteria, that fact destroyed complainant's claim for exemption, and it was also contended that as both the sleeping-rooms and the cafeteria were conducted for intended profit, that that also deprived the complainant of its exemption, *pro tanto*, as to the assessed value of the parts of the building used for those purposes. We must bear in mind that everything in the building is conducted by the association under one roof, and as part of a plan which is used in carrying on the purposes of the association. This case is not like the case of an association that occupies three or four upper floors of a building, and rents the store-rooms on the first floor, nor is it like the case of an association that conducts an entirely separate business, like that of book selling. It is admitted on the record that the sleeping-rooms are used only for members of the Young Men's Christian Association, and principally by members of the local association, and that the cafeteria was installed for the purpose, primarily, of serving meals for those who reside in the building and who are members of the association. In other words, the entire use of the sleeping-rooms is by members of the association, and the use of the cafeteria by outsiders is only incidental. . . ."

Applying to the facts of the instant case the principles of law so clearly stated by Mr. Justice Maxey in the Germantown case, we reach the inevitable conclusion that the appellant is exempt from taxation on the parts of its buildings used for the purpose of dormitory and food service facilities. Specifically: (1)

Affirmative legislation has been shown in support of appellant's claim; (2) the evidence clearly establishes that the "actual use and occupation" of the premises is primarily for the designated charitable object and not largely for commercial purposes. This object is to furnish wholesome living conditions to young men at a price they can afford to pay and thereby correct the social evils that surround men who would otherwise be compelled to live in cheap rooming houses, amid sordid environments; (3) in light of the nominal charges, the free accessibility of facilities, the services furnished, and the losses sustained from the operation, the portions of property in respect to which exemption is claimed possesses an "eleemosynary characteristic not possessed by institutions or property devoted to private gain or profit."

What is "given" is more clearly gratuitous than for a price which impresses one as being proportionate to the services rendered.

Respondent's brief cites many cases decided before the Germantown case which also express the rules of law relating to tax exemptions. This court certainly gives full merit to the holdings of these cases, but has little difficulty in distinguishing them from the facts of the present controversy. It is apparent that in American Sunday School Union v. Philadelphia et al., 161 Pa. 307; Daugherty Trustee v. Philadelphia et al., 314 Pa. 298; Pocono Pines Assembly, etc., v. Monroe County, 29 Pa. Superior Ct. 36; Sisters of the Blessed Sacrament, 38 Pa. Superior Ct. 640, and Young Men's Christian Association v. Donohugh, 7 W. N. C. 208, the particular use of the portion of the premises taxed was in each case clearly ancillary to the charitable objects of the organization involved. The portions taxed were not used directly in the attainment of the charitable aims of the institu-

tions, and hence were not "necessary to the occupancy and enjoyment" of such institutions.

Reference to decisions of the courts of other states reveal that they are almost unanimous in holding that similar facilities in YMCA organizations are entitled to a charitable exemption. The cases of St. Louis YMCA v. Gehner et al., 320 Mo. 1172, 11 S. W. 2d 30, and St. Louis YMCA v. Gehner, City Assessor, et al., 329 Mo. 1007, 47 S. W. 2d 776, cited by the court in the Germantown case, were overruled in Salvation Army v. Hoehn, 354 Mo. 107, 188 S. W. 2d 826, and Missouri Goodwill Industries v. Gruner, 357 Mo. 647, 210 S. W. 2d 38.

Similarly, the lower courts of this State have been almost unanimous in holding the same facilities of the many YMCA's located here are not subject to taxation.

Having thus disposed of the problem of the dormitories and food service facilities, the incidental problem of bowling alleys, barber shops, and businessmen's health clubs is easily resolved. The same principles of law are applicable. The Downtown branch contains a small barber shop occupying less than one-half of one percent of the building space. Although union barbers are employed and union rates charged, the shop is in the basement and cannot be entered from the street. No advertising is done, the shop being operated primarily for the convenience of residents and members. Since the barber shop occupies such a negligible portion of the property, and is operated in a manner not commercial in nature, it is purely incidental to the furnishing of a home for young men and is likewise exempt from taxation.

Bowling alleys are maintained in the Allegheny and South Hills branches for the use of residents and members exclusively. A moderate charge is made for such use. Since the alleys are not open for public use they do not compete with commercial establishments

and are only incidental to the overall operation of the organization. The charitable purposes of the YMCA include the physical improvement of its members. Certainly the bowling facilities, under the facts of this case, are reasonably necessary to the attainment of this end. That a small charge is made for their use is immaterial; the facts here clearly warrant their exemption from taxation.

The businessmen's health clubs operated in the Downtown, East Liberty and Allegheny branches do not deprive appellant of its right to a charitable exemption. Such clubs are a part of the YMCA in these branches and provide facilities such as steam baths, massage, and special locker rooms for men who desire somewhat different accommodations than the ordinary general members do. An additional fee is charged for membership in the clubs. The facts here show that these clubs constitute merely special activities of the branches from which they operate and are not commercial enterprises; membership in the club includes membership in the YMCA. The space occupied by them is negligible in comparison with the total space, and the number of businessmen's health club members is small in relation to the total membership of the branches involved. That many of the members of such clubs were over 35 years old is immaterial, since it cannot be concluded that the clubs were in any way commercial activities, competing with similar clubs.

All of the premises of the branches used in the pursuit of the association's charitable aims are exempt from taxation, and the incidental use of such premises for a club should not alter this result.