**WHOLISTIC LIFE CHURCH, INC., Appellant,**

v.

**Kenneth CHRISTERSON, McDonald County Assessor, and Cloteel Atkins, McDonald County Collector, Respondents.**

**No. 21713.**

Missouri Court of Appeals, Southern District, Division One.

April 28, 1998.

Robert W. Evenson, Evenson, Carlin & LePage, Pineville, for appellant.

Duane A. Cooper, Pros. Atty., McDonald County, Pineville, for respondents.

CROW, Judge.

Plaintiff, Wholistic Life Church, Inc., filed this suit against two McDonald County officials: the assessor, Kenneth Christerson, and the collector, Cloteel Atkins. Plaintiff sought a declaratory judgment that the real estate it owns in McDonald County was exempt from taxation for the years 1994, 1995 and 1996. After an evidentiary hearing, the trial court ruled otherwise. Plaintiff appeals.

Before addressing Plaintiff's three points relied on, this court briefly mentions two procedural features of this case.

First, Plaintiff filed its notice of appeal in the Supreme Court of Missouri. That court entered the following order:

1. References to statutes are to RSMo 1994.

2. Plaintiff's president testified the property was to be used as a training site for "the 1980 Olympics," but that never happened because the

"Cause ordered transferred to the Court of Appeals, Southern District where jurisdiction is vested. Mo. Const. art. V, § 11; Alumax Foils, Inc. v. City of St. Louis, 939 S.W.2d 907 (Mo. banc 1997)."

Second, Plaintiff did not pursue its administrative remedy by seeking relief from the McDonald County Board of Equalization per § 137.275.[1] Were it not for *Council House Redevelopment Corp. v. Hill*, 920 S.W.2d 890 (Mo. banc 1996), it would be arguable that Plaintiff's failure to exhaust its administrative remedy barred Plaintiff from bringing this action. However, as this court understands *Council House*, inasmuch as Plaintiff maintains that all of its real estate is exempt from taxation, Plaintiff was not compelled to pursue its administrative remedy. *Id.* at 891–95. Academicians interested in the exhaustion doctrine as applied in property tax disputes can study *Council House*.

Plaintiff, a Massachusetts corporation, was incorporated in 1985.

On November 22, 1993, the Secretary of State of Missouri issued a certificate declaring that Plaintiff was authorized to transact business in Missouri as a foreign, not-for-profit corporation.

In 1994, Plaintiff bought some 928 acres in McDonald County. The evidence at trial—April 2, 1997—revealed there are improvements on the acreage including: (1) a building which houses Plaintiff's administrative office and a "clinic," (2) a "huge building" which houses commercial kitchen facilities, a dining hall, exercise facilities, a music room with a piano, a "big whirlpool," and a library with "thousands of books," (3) an eight-bedroom "stone house" where most of Plaintiff's staff resides, (4) ten "cabins," (5) a barn, and (6) a swimming pool and "pool house."[2]

Plaintiff's president testified Plaintiff has over 150 members and a staff of about 12. Referring to Plaintiff's "Articles of Organization," the president explained that one of Plaintiff's purposes is to "create and build all

Olympics were "boycotted." The president added that the owner died in 1983 and the property was "abandoned for ... almost ten years ... getting vandalized and falling apart."

possible avenues for individuals [to] freely develop in the spiritual oneness of God." Asked what that meant, the president responded:

"What we mean by that is that we feel that, when a person is born, that God has given them everything that they need and that, for some reason, he's given us all these tests and these obstacles; and most people that I know have kind of gotten away from that throughout their life, so we're trying to help people remove some of those blocks or even just to become aware of them so that they can become closer to God.

... we consider our physical body to be the temple of the soul, and so we try to show people what our knowledge is in terms of keeping as healthy as possible. We believe ... that, if we take foods and put chemicals into them and preservatives, those are things that the body is unaccustomed to and it makes the body unhealthy. If you take a natural grain ... wheat, for instance, and you grind it all up and you take everything out of it and bleach it, that that's not the way that it was intended to go in the body, so it causes some physical problems. So we just try to let people know about that, and they can make the decision on how to correct their eating habits.

... we teach people about exercise ... a whole program of classes which they can just learn about their body and how it works ... how food combines, the chemistry of food combination, exercise, just kind of learning about that .... why we use the word wholistic is because we believe that the physical health isn't separated from the rest. We believe in four things, that it's mental, emotional, spiritual, and physical health, and they all combine together."

The president identified Plaintiff's Exhibit 10 as "our statement of purpose pretty much." A copy of the exhibit is attached at the end of this opinion.

In pursuit of its purposes, Plaintiff offers: (1) counseling by its ministers—"six or seven" in number, (2) a "free health clinic" providing "massage and chiropractic" services, (3) nature trails which people can use for walking and "contemplation, meditation ... solitude and being close to nature, which is also being close to God," and (4) "church services," the location of which depends on "the amount of people and the weather." Such services are held every Sunday and "throughout the week depending on the need." Asked who "preaches" at the services, Plaintiff's president explained that Plaintiff's ministers take turns, and Plaintiff also allows "people to speak that aren't ministers."

One becomes a minister by completing a four-year program at Plaintiff's "theology school." Asked where that was, Plaintiff's president answered, "At our church." According to the president, "A lot of people teach [the classes]."

Plaintiff has a nine-member board of directors, but no shareholders. If Plaintiff is dissolved, any assets remaining after payment of liabilities must go to "one or more organizations exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code."

Plaintiff's funds come primarily from those who attend Plaintiff's programs and utilize the services Plaintiff offers.

As shown in Plaintiff's Exhibit 10, programs cover subjects including physical therapy, nutritional guidance, dance, exercise and movement, anatomy, physiology and other physical sciences, digestion, proper food combinations, universal ecology, philosophy, and dream analysis. Plaintiff's president testified that all programs and services are free, but Plaintiff asks everyone "for a donation if they can afford it."

Once a year, Plaintiff has a two-day "expo" featuring exhibits, speakers and workshops. An announcement for the 1996 expo listed, *inter alia:* "Acupressure, Air Filtration, Aromatherapy, Bio-magnetics, Bodywork/Massage, Bodywork Tables & Supplies, Books/Magazines, Chinese Medicine, Chiropractic, Composting, Dowsing, Energy Healing, Environmental Prod., Health Foods, Herbology, Homeopathy, Iridology, Juicing, Midwifery, Naturopathy, Non-toxic Home Items, Organic Gardening, Organic Seed Sources, Polarity, Reflexology, Skin Care,

Solar Energy Systems, Stress Management, Water Purification."

Those attending the expo are asked for a five-dollar donation, but "if people can't pay it, they can come in anyway."

Plaintiff's president testified, without contradiction, that Plaintiff welcomes everyone, regardless of religious belief. Even atheists are not turned away. The only rules of conduct on Plaintiff's property are that no smoking, alcohol or non-prescription drugs are allowed.

Endeavoring to contradict the testimony of Plaintiff's president that Plaintiff's funds come entirely from donations, Defendants' lawyer produced an exhibit denominated "Guest Account," sent by Plaintiff to a resident of Belmont, Massachusetts. The exhibit showed a balance due of $400 for a one-week "Family Day Workshop." Plaintiff's president explained that some guests "offer a pledge," and Plaintiff sends "reminders" if the pledges remain unpaid.

Defendants' lawyer also presented evidence that the donations Plaintiff requests from attendees who register in advance are less than the donations Plaintiff requests from unregistered attendees at the door.

Plaintiff's annual "cash flow" statements show:

| Year | Income [3] | Expenses | Surplus or Deficit |
|------|-----------|----------|--------------------|
| 1993 | 134,792.19 | 114,198.51 | 20,593.68 |
| 1994 | 192,729.59 | 209,144.49 | (16,414.90) |
| 1995 | 136,373.30 | 156,007.59 | (19,634.29) |
| 1996 | 167,971.80 | 159,234.10 | 8,737.70 |

Plaintiff paid $578,000 for the property in dispute. Plaintiff's president testified there are two "bank mortgages" on the property, one of which is a "balloon note." Asked how much will be due on that note when the time for payment arrives, Plaintiff's president responded: "I honestly don't remember. I try not to think about things like that." Plaintiff has accumulated no reserves to pay the note.

Plaintiff's president testified that Plaintiff had "just received a [$10,200] grant from Wal–Mart"—Plaintiff's first grant. Its purpose was to improve insulation and reduce

heat loss in Plaintiff's facilities. Plaintiff considered the grant "like a donation."

No one on Plaintiff's staff receives a salary. Some staff members earn income from employment off Plaintiff's premises.

Plaintiff provides housing and food for its staff on its premises. Some staff members make donations to Plaintiff.

The chiropractic services offered by Plaintiff at its clinic are provided by chiropractors who practice elsewhere and donate their time at the clinic. Plaintiff does not accept "insurance payments" for the chiropractors' services.

In 1987, the Internal Revenue Service determined that Plaintiff qualified for classification as a church under § 170(b)(1)(A)(i) of the Internal Revenue Code, and was therefore not required to file federal income tax returns.

In 1993 (the year the Secretary of State of Missouri recognized Plaintiff as a foreign, not-for-profit corporation), the State of Missouri granted Plaintiff an exemption from Missouri sales and use taxes on purchases and sales "within the conduct of [Plaintiff's] exempt religious, charitable, civic or educational functions and activities."

Mo. Const. Art. X, § 6 (1945, amended 1972 and 1982) reads, in pertinent part:

"1 .... all property, real and personal, not held for private or corporate profit and used exclusively for religious worship, for schools and colleges, for purposes purely charitable ... may be exempted from taxation by general law."

Section 137.100 reads, in pertinent part:

"The following subjects are exempt from taxation for state, county or local purposes:

....

(5) All property, real and personal, actually and regularly used exclusively for religious worship, for schools and colleges, or for purposes purely charitable and not held for private or corporate profit, except that the exemption herein granted does not include real property not actually used or

---

3. The statements show Plaintiff's income consists primarily of donations, but a small amount comes from loans.

occupied for the purpose of the organization but held or used as investment even though the income or rentals received therefrom is used wholly for religious, educational or charitable purposes;

...."

The trial court considered whether Plaintiff's real estate was exempt from taxation because Plaintiff used it exclusively for (a) religious worship, or (b) purposes purely charitable. In a thoughtful and articulate seven-page judgment, the trial court held Plaintiff's real estate did not meet the criteria for either exemption.

This court first addresses Plaintiff's third point relied on, which reads:

"The trial court erred in applying the law in finding that [Plaintiff] was not entitled to exemption from taxation as a charitable organization, using it's [sic] property for purposes purely charitable, under section 137.100(5) RSMo., when the evidence was uncontroverted, that; (1) the property was owned, and operated, on a not for profit basis, so there could be no profit, presently or prospectively, to individuals or corporations; (2) the property was dedicated, unconditionally, to a charitable activity; (3) the dominant use of the property was for the benefit of an indefinite number of people, and there was a direct, or indirect, benefit to society, as a result of the benefits conferred on the persons served by [Plaintiff]."

Much of the evidence germane to the above claim of error has already been set forth in this opinion. However, there was other pertinent evidence; it is recounted hereunder.

Plaintiff's president testified that a young man, S__, born with "some kind of crippling arthritis," resided on Plaintiff's premises. S__ had undergone approximately twelve surgical procedures on his legs and had been abused by his mother and her "boyfriends." According to the president, S__ will "be staying with us for an indefinite period of time." S__ is paying nothing, as he has no assets.

Plaintiff's president described another individual, K__, who "had a brain tumor re-moved." He resides on Plaintiff's premises and has no money.

Plaintiff's vice president testified that a lady and her child had resided on Plaintiff's premises "off and on ... about four years." The vice president also told the trial court about four children who "stayed at the center for two or three years" because their parents could not take care of them. One such child, age five, was there at time of trial. The expense of caring for such children was borne by Plaintiff.

In addition to long-term residents such as those described above, the coordinator of the health clinic testified that the clinic provides services for "ten to fifteen" people per week.

The trial court, relying on *Missouri Church of Scientology v. State Tax Commission*, 560 S.W.2d 837, 844[10] (Mo. banc 1977), correctly noted that taxation is the rule and exemption therefrom the exception.

The facts found by the trial court included these: Plaintiff is operated on a not-for-profit basis; donations are accepted and encouraged, but not required; attempts are made to collect pledges, and reminders are mailed to delinquent pledgors, a practice common to many not-for-profit, charitable organizations; homeless persons and families have been housed for extended periods on Plaintiff's premises without charge. Those findings are amply supported by the record.

Based on those findings, the trial court concluded that Plaintiff "provides some charitable services which, if not provided, would cause a small but unknown number of persons to become public charges." The trial court further found that "some charitable clinic services are provided." Despite those findings, the trial court ruled that Plaintiff had not met its burden of proving that its property was used exclusively for purposes purely charitable.

In *United Cerebral Palsy Association of Greater Kansas City v. Ross*, 789 S.W.2d 798 (Mo. banc 1990), the Supreme Court of Missouri had to decide whether an office building was used exclusively for purposes purely charitable, thereby exempting it from taxation. The court applied the three-part test established in *Franciscan Tertiary Province*

*of Missouri, Inc. v. State Tax Commission,* 566 S.W.2d 213 (Mo. banc 1978). The opinion in *United Cerebral Palsy* said:

> "*Franciscan* first requires that the property be actually and regularly used exclusively for purposes purely charitable as defined in *Salvation Army v. Hoehn,* 354 Mo. 107, 188 S.W.2d 826, 830 (1945).[ 4] . . .
>
> The second part of the *Franciscan* test demands that the property be owned and operated on a not-for-profit basis. . . .
>
> Third, *Franciscan* states that the dominant use of the property must be for the benefit of an indefinite number of people and must directly or indirectly benefit society generally."

*United Cerebral Palsy,* 789 S.W.2d at 800–01.

Plaintiff maintains it met the first part of the *Franciscan* test in that it: "offers workshops to the public; pastoral counseling; free chiropractic clinics; . . . an annual expo which promotes healthy lifestyles, and a clean environment; offer[s] a sanctuary for troubled or disabled individuals [and] for mothers and children; [Plaintiff's] buildings, and facilities, are open to the public; [Plaintiff has a] library with thousands of books on general health, and education, available to the public; the nature trails and woods are open to the public and [Plaintiff's] religious services are open to the public." Plaintiff emphasizes that everything offered is free to everyone, and no one is refused.

Given the definition of a charity in *Salvation Army,*[5] relied on by the Supreme Court of Missouri in *United Cerebral Palsy,* 789 S.W.2d at 800, this court holds that the evidence found credible by the trial court satisfies the first part of the *Franciscan* test.

In so holding, this court does not ignore *Pentecostal Church of God of America v. Hughlett,* 601 S.W.2d 666 (Mo.App. S.D.

1980), cited by Defendants. There, a church owned land on which six houses were situated. *Id.* at 667. The houses were used as residences for the church's executives, who paid no rent. *Id.* This court held the property was not exempt from taxation, explaining that the occupants were not needy or infirm, and their care would not be a charge on the state were the houses not provided. *Id.* at 669.

Obviously, *Pentecostal Church* differs from the instant case. There, only the church's executives could occupy the houses; the property was not open to the general public or even a classification of members of the general public. Furthermore, the purpose of the houses in *Pentecostal Church* was not to furnish shelter for those whose care would otherwise burden the government. *Pentecostal Church* does not aid Defendants.

As to the second part of the *Franciscan* test, the uncontradicted evidence was that Plaintiff is authorized to transact business in Missouri as a foreign, not-for-profit corporation. Furthermore, as noted earlier, the trial court found: "That Plaintiff is not-for-profit is without dispute." That finding is amply supported by the evidence. This court holds the record establishes that Plaintiff conducts the activities and provides the services on its premises on a not-for-profit basis.

The third part of the *Franciscan* test is where Defendants voice their loudest challenge to Plaintiff's claim that its land is exempt from taxation. Defendants assert:

> "Clearly [Plaintiff] does not perform services which benefit an indefinite number of people. The only people to benefit are the ministers themselves. Society, it would appear[,] would be uninjured if [Plaintiff] ceased its services."

The law is contrary to Defendants' argument. It is clear from *Salvation Army,* 188

---

**4.** *Salvation Army* defined a charity as "a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government." 188 S.W.2d at 830. The court in *Salvation Army* explained: "A charity may re-

strict its admissions to a class of humanity, and still be public; . . . as long as the classification [of those eligible for benefits] is determined by some distinction which involuntarily affects or may affect any of the whole people, although only a small number may be directly benefited, it is public." *Id.*

**5.** Footnote 4, *supra.*

S.W.2d at 830, that an entity can be a charity even if it benefits only a small number of people. Furthermore, providing housing and food for its staff on its premises does not prevent Plaintiff from satisfying the requirement that the dominant use of its property is for the benefit of an indefinite number of people and such use directly or indirectly benefits society generally.

In *Central States Christian Endeavors Association v. Nelson*, 898 S.W.2d 547 (Mo. banc 1995), the Supreme Court of Missouri had to decide whether property owned by a not-for-profit corporation adjacent to a university campus and used for a "Christian campus house" was exempt from taxation. *Id.* at 548. The owner, referred to in the opinion as "CSCEA," rented three bedrooms in the facility to students who were "professed Christians." *Id.* at 549. The rent was lower than that charged for dormitories and similar housing in the community. *Id.* The student tenants were required to be active in CSCEA's campus ministry. *Id.* They were also required to lead a group that kept contact with students attending Bible studies and to perform other tasks related to the ministry. *Id.*

Holding the property exempt from taxation, the Supreme Court said:

"[T]here is substantial evidence from which the trial court could conclude that CSCEA's purposes in renting the rooms to students were incidental to religious worship. By renting its rooms to a few students, CSCEA is able to provide a clean and accessible facility available to all those to whom it ministers. The full-time presence of student leaders at the facility is closely related to CSCEA's religious purpose. The students are readily available and required to plan, promote and execute the religious worship activities. This is not a case where the rental is unrelated to the tenants' religious activities and where the rent paid is equivalent to that in the general community.... Providing low cost housing to persons required to actively participate in advancing a religious worship purpose in a facility is incidental to religious worship, even though the hours spent socializing, eating, studying or resting may exceed the hours spent in purely religious devotions."

*Id.* at 550.

In the instant case, the members of Plaintiff's staff who reside on Plaintiff's premises are there to enable Plaintiff to provide the services it offers. Staff members perform maintenance on the buildings and grounds, cook food, lead meetings, coordinate services, provide counseling and teach classes.

This court holds the evidence found credible by the trial court satisfies the third part of the *Franciscan* test, i.e., the dominant use of the property must be for the benefit of an indefinite number of people and must directly or indirectly benefit society generally.

Having determined that Plaintiff meets all three requirements of the *Franciscan* test, this court finds Plaintiff's third point meritorious. This court holds the facts found by the trial court, together with the evidence deemed credible by the trial court, establish as a matter of law that Plaintiff uses its land in McDonald County exclusively for purposes purely charitable. Consequently, § 137.100(5) exempts the land from taxation. That holding renders Plaintiff's first and second points moot, hence this court need not consider them.

The trial court's judgment is reversed. Pursuant to the authority conferred on this court by Rule 84.14, Missouri Rules of Civil Procedure (1998), this court enters judgment that the property identified in Plaintiff's petition is exempt from taxation by McDonald County for the years 1994, 1995 and 1996.

GARRISON, P.J., and PREWITT, J., concur.

# The Wholistic Life Center

## Our Creed

I have the ultimate power within me to create and change all things for myself –

To embrace the unlimited Universe –

To love, accept, and nourish everything –

To give freely my infinite energies towards the creation of the highest levels of spiritual, mental, emotional and physical life –

Since ALL is a reflection of myself through God.

**Location:** In Washburn, Missouri, offering the untouched pristine beauty of Ozark country. Local air transportation is located in Fayetteville, Arkansas. Regional airports in Tulsa, Oklahoma and Springfield, Missouri.

**Availability:** Open year-round for nutritional, educational and spiritual workshops.

**Setting:** Located on 900 rolling acres of open land including lakes and trails for walking and climbing. Facilities include semi-private cabins, recreation and athletic facilities, and family-style dining hall.

**Directions:** Follow Route 71 South from Joplin, Missouri to Route 90 east. Drive on Route 90 east to the intersection of Route KK (approximately 20 minutes). The entrance to the Wholistic Life Center is immediately on the left. Enter and drive one mile to the gate house.

The Wholistic Life Center
Route 1 Box 1783
Washburn, Missouri 65772
(417) 4352212

A non-sectarian non-profit organization serving humanity through love and understanding.

PLAINTIFF'S EXHIBIT
#10

# 21713

The program at the Wholistic Life Center creates an atmosphere that restores the natural balance of love, understanding and freedom; giving people the opportunity to expand their concept of themselves and become open to their own true potentials and capabilities. Each program creates a new opportunity to experience others, to explore similar problems, hopes, worries, dreams, fears, and aspirations; and offer support, guidance, and motivation in a creative environment with freedom to explore the new possibilities life has to offer in a way that helps clarify and solidify the true meaning of life.

It is our firm conviction that there exists answers for all questions, and solutions for all problems. We wish to create the natural, peaceful, and challenging environment in which a person may let go of undesirable habits. Through awareness, exposure to others, learning and implementing, a person may freely choose to replace unhealthy manifestations with positive and loving ones.

The Wholistic Life Center offers a wide range of studies including physical therapy, nutritional guidance, dance, exercise and movement classes, lectures and programs on anatomy, physiology and other physical sciences, digestion, proper food combining, universal ecology, philosophy, dream analysis, and other approaches to acquaint people with new knowledge and ideas.

*Who we are*

Our purpose and objective is to help each individual to integrate all aspects of his total awareness and reality — to create, expand upon and implement all possible avenues for a person to be rejuvenated into the natural flow of life — providing every possible learning or re-learning experience to eliminate myths, correct misunderstandings and replace erroneous interpretations — be they of a health and nutritional nature or of a more deep and profound emotional, psychological or spiritual nature.