THE SALVATION ARMY, Appellant, v. ARTHUR C. HOEHN ET AL.—No. 39098.—188 S. W. (2d) 826.

Court en Banc, June 4, 1945.

Rehearing Denied, July 2, 1945.

*Buder & Buder* and *Neuhoff & Millar* for appellant.

*George L. Stemmler* and *Joseph F. Holland*, City Counselors, *Henry A. Hamilton* and *Charles J. Dolan*, Associate City Counselors, for respondents Arthur C. Hoehn and Louis Nolte, *Eugene M. Guise* for respondent Richard E. Gruner.

*Wilbur B. Jones, Arthur J. Freund* and *Sam Elson* for St. Louis
Y. M. C. A., amicus curiae; *Salkey & Jones* of counsel.

BRADLEY, C.—Action against the St. Louis Assessor, Comptroller, and Collector for a declaratory judgment to the effect that plaintiff's (appellant's) described property in St. Louis is exempt from taxation and ▮ to enjoin the collection of taxes against said property. The trial court denied relief and plaintiff appealed. Jurisdiction of the appeal is in the supreme court because the construction of the Constitution and the revenue laws of the state is involved. Sec. 12, Art. 6, Constitution.

Plaintiff owns the lot (100 feet by 109 feet, 1 inch) and the building thereon at 1803 Pine Street, St. Louis. The building (basement and 13 stories) was erected in 1928 and was first known as the Robert E. Lee Hotel, but when plaintiff became the owner it was known as the Auditorium Hotel. Plaintiff became the owner by purchase at a second mortgage foreclosure sale in 1939. The bid, plus a first mortgage assumed, was $108,000. In plaintiff's hands, the building became the St. Louis Evangeline Residence of the Salvation Army. June 1, 1942, the property was assessed at $281,500. In April, 1943, the Board of Equalization reduced the assessment to $272,500. The reduced assessment and the taxes due thereon in 1943 are the assessment and taxes involved here.

Plaintiff contends that the property is exempt from taxation under Sec. 6, Art. 10, Constitution, and Sec. 10937, R. S. 1939, Mo. R. S. A., Sec. 10937. The Constitution provides that "lots in incorporated

cities . . . with the buildings thereon, *may* be exempted from taxation, when the same are used exclusively for religious worship, for schools, or for purposes purely charitable'' (italics ours). The statute provides that property so used *shall* be exempt. Plaintiff's property is less than one acre and there is no claim that it is used *exclusively* for religious worship or *exclusively* for schools, hence the sole question: Is the property used *exclusively* for purposes *purely* charitable?

Plaintiff was incorporated in Illinois May 29, 1913. The object and purpose of plaintiff, as given in its charter is ''to further the work of the Christian Church known as The Salvation Army, and to engage in charitable, educational, missionary, philanthropic and religious work of the character that has been and is being conducted by the branch of the Christian Church known as The Salvation Army, and to do everything, and to act and carry on every kind of operation necessary and incidental to the maintenance of such beneficial, educational, charitable, missionary, philanthropic and religious work, but that all of such work shall be conducted not for pecuniary profit . . .''

As stated, the building has a basement and 13 stories. In the basement are the boiler room, food storage room, laundry room, recreation room, baggage room, office and shop of the building engineer, and dressing room for the building employees. On the first floor are the lounge or lobby, a social room large enough to accommodate 35 people and furnished with dishes, electric stove, cooking utensils, dining room and kitchen, library, chapel, secretary's office, rest room for employees. On the second floor are linen room, housekeeper's room, manager's office, two guest rooms, auditor's office and room, manager's apartment, storage room. Each of the 11 floors above the second contains 17 bedrooms and each has bath and telephone.

Women and girls desiring to live at the Evangeline Residence are required to file a written application and give age, nationality, nearest relative and address, church, occupation, employer's name and address (if employed), how long employed, salary, two references, type of room desired, single or double. Religion and nationality are not considered in passing on application. The rooms are $11.50 per week for single, and $9.50 or $10.00 per person for double. Included in these charges are 15 meals per week, 3 on Sunday and 2 on week days. Of the amount paid by each per week, $5.35 was allocated to food, the remainder to lodging. Outside telephone calls from the rooms are 10 cents each, but on the first floor are two toll telephones from which an outside call may be made for 5 cents. No charge is made for incoming calls and the telephone operation shows a loss. A charge of 10 cents is made for room service of meals. Each guest may each week use electric iron for 1 hour free, but over 1 hour, 10 cents per hour is charged. At the time of the trial, 269 girls and women lived at the Evangeline Residence. The Evangeline Residence is not open

to the public. Occupants are selected on the basis of facts stated in the application.

Summarized from the record plaintiff, in the brief, says: "There is no intention, or effort, to make any profit out of the Evangeline Residence, and that is the reason for the very low rate. Needy and deserving applicants are subsidized by being granted a reduction in the rates above mentioned. The weekly charges, above mentioned, of $9.50 to $11.50 per week, including 15 meals, contrast with a weekly rate of $17.50 per week, exclusive of meals, at the Auditorium Hotel, before the purchase of the property by the Salvation Army; a minimum rate of $2.50 per night, exclusive of meals, at the Claridge Hotel, operated in a similarly constructed building two blocks away, and rates of from $20 to $40 per month for room only in the Milner Hotel, formerly the Marquette, located three blocks from the Evangeline Residence and approximately 25 years older. Outside of the salaries paid those actually engaged in the operation of the Evangeline Residence, the compensation of the Salvation Army staff being extremely nominal."

The fiscal year for the Evangeline Residence begins on October 1, and ends on September 30. For the year ending September 30, 1940, the loss was $21,754.93; for the year ending September 30, 1941, the loss was $8,218.49; for the year ending September 30, 1942, the loss was $3,842.70; for the year ending September 30, 1943, there was a gain of $4,427.29. The losses over the 4 years was $29,388.83. These losses were made up from the general funds of the Salvation Army.

We quote again from appellant's brief: "As part of the program of operation of the Evangeline Residence, consultations are held with the residents, regarding their personal problems, and they are afforded the advice, guidance and counsel of the Salvation Army officers engaged in the operation of the Evangeline Residence. One or more Salvation Army officers are on duty at all times during the 24 hours, and are available for such purposes. On occasions appellant's officers have remained up all night with sick guests. No male visitors are permitted above the first floor and no intoxicating liquors are allowed on the premises. Classes were conducted twice a week in French, German and Spanish with an instructor from the WPA in charge. From 30 to 40 of the guests attended the classes, for which no charge of any kind was made. These classes have been discontinued, however, because instructors are no longer available due to current war conditions. Classes for First Aid instruction were held by the Red Cross at the Evangeline Residence. The Bible classes still continue."

██ It is common knowledge that the Young Men's Christian Association, the Young Women's Christian Association, commonly referred to as the YMCA and the YWCA, and the Salvation Army (and there are others) are benevolent, religious, and educational institutions, but even so, the properties of such institutions are not exempt from

taxation merely because of the stated or corporate purpose. Exemption depends on the *use* of the property as well as the general purpose for which intended.

The St. Louis YMCA, incorporated in 1877, has made three attempts, appearing in the books, to have certain property exempt from taxation. These cases are State ex rel. Koeln v. St. Louis Y. M. C. A. et al. (Div. 2-1914), 259 Mo. 233, 168 S. W. 589; State ex rel. St. Louis Y. M. C. A. v. Gehner et al. (banc - 1928), 320 Mo. 1172, 11 S. W. (2d) 30; St. Louis Y. M. C. A. v. Gehner et al. (banc), 329 Mo. 1007, 47 S. W. (2d) 776, 81 A. L. R. 1449.

In the first YMCA case two buildings were involved, one a 5-story and the other a 3-story (as appears from the record of that case, which we have examined). About 15 percent of the whole floor space of these buildings was "rented for stores and other commercial purposes." The remaining 85 percent of the floor space was used "for purposes purely charitable." Exemption from taxation was properly denied because a part of the building was concededly used for purposes purely commercial.

In the second YMCA case (320 Mo. 1172, 11 S. W. (2d) 30), three buildings were involved, a 10-story and basement, and two 4-story and basement buildings. The 10-story building was designated as the Downtown Building. In the basement were the men's lobby, lounge, reading and writing room, soda fountain, and offices. Also in the basement were the boys' lobby, game and club rooms and boys' offices and locker rooms for both men and boys. On the first (ground) floor were a cafeteria, barber shop, tailor shop, community boys' club, shower bath, and swimming pool; second floor, the assembly hall for general use, educational class rooms for the YMCA school, gymnasium, and office; third floor, three handball courts, educational class rooms; fourth floor, office of Metropolitan Church Federation, general YMCA offices, bed rooms; fifth floor, three handball courts, bed rooms; sixth, seventh, eighth, ninth and tenth floors, bed rooms. Rent for single rooms was from $5.75 to $6.75 per week, double rooms, $3.50 to $5.00 per week per person. Written application for a room was required which was passed on by the board of managers. One lodging regularly in the building was required to hold full privilege membership in the downtown ██ branch of the YMCA. Occupancy of a room for less than a week was charged for at transient rate. Members of the YMCA patronized the cafeteria and their friends were invited to patronize it, but no general invitation was extended to the public. Boys between 9 and 11 and who could afford it were charged $3.00 per year for using the gymnasium and swimming pool; between 12 and 14 years the charge was $5.00 per year. The charge increased with age, and after the age of 25 the charge was $24.00 per year. The use of the other two buildings was similar to that of the Downtown Building.

As appears, supra, in the second YMCA case there was operated in the Downtown Building a tailor shop, a barber shop, and a soda fountain. Of these the court said (320 Mo. 1. c. 1183, 11 S. W. (2d) 1. c. 35) : "These businesses, like that of furnishing meals, reputable though they all are, *cannot be considered either religious, educational or charitable work*" (italics ours). The opinion goes on to review quite a number of cases and then this (320 Mo. 1. c. 1189, 11 S. W. (2d) 1. c. 37) :

"It will therefore be seen that the test for tax exemption is not the number of good purposes to which a building may be put, nor the amount of good derived by the general public in the operation of such purposes, but whether the building is used exclusively for religious, educational, or charitable purposes. If it is used for one or more commercial purposes, it is not exclusively used for the exempted purposes but is subject to taxation. The by-laws of relator provide that full membership in the association is required before one may rent a room. Yet the record discloses that this by-law has been ignored, for relator has rented its rooms to men from other cities, other states, and other countries, who may well be termed transients in St. Louis, some of whom paid, but others showed no disposition whatever to pay. Before renting a room, relator required the resident to execute a written agreement, in which the terms of the rental, the rights of the occupant, the time of payment, and the liability of relator were fully set forth. *We cannot see how the renting of a room to one not a member of relator and the execution of such an agreement can be termed religious worship, education, or charity.* True, some of the occupants of the rooms claimed they were unable to pay, and did not pay, and doubtless never will pay, yet there was an obligation to pay, and relator accepted of pay when offered by these parties, some of whom were nonresidents of the state" (italics ours).

After the decision in the second case (320 Mo. 1172, 11 S. W. (2d) 30) the YMCA construed the opinion to hold that if its service, in the manner appearing in the second case, was confined solely to its members, then its property would be exempt from taxation. On the theory that such was a fair construction of the opinion the YMCA limited its service to its members and brought the third suit. St. Louis Y. M. C. A. v. Gehner et al., 329 Mo. 1007, 47 S. W. (2d) 776, referred to, supra. The setup, service, charges, etc. do not appear in detail as in the report of the second case (11 S. W. (2d) 30), but it does appear that when the third suit was brought the setup, service, charges, etc. were about the same as in the second suit, except service was confined to its members. Exemption was again denied. It was held (329 Mo. 1007, 47 S. W. (2d) 1. c. 778) that the YMCA, in effect, "was conducting hotels or boarding houses" for pay, and rendering other services for which it made charges, the barber shop, tailor shop, soda fountain, swimming pool, etc. In other words, the holding was

to the effect that the services, even though wholly without profit, were not *exclusively and purely charitable*. The opinion in the third case so construed the opinion in the second case and followed it.

"An intention on the part of the legislature to grant an exemption from the taxing power of the state will never be implied from language which will admit of any other reasonable construction. Such an intention must be expressed in clear and unmistakable terms, or must appear by necessary implication from the language used, for it is a well settled principle that, when a special privilege or exemption is claimed under a statute, charter or act of incorporation, it is to be construed strictly against the property owner and in favor of the public. This principle applies with peculiar force to a claim of exemption from taxation." The above from 2 Cooley on Taxation (4th Ed.), Sec. 672, p. 1403, was quoted with approval in the third YMCA case. See also, Fitterer v. Crawford, 157 Mo. 51, l. c. 58, 57 S. W. 532, 50 L. R. A. 191.

The rule of strict construction in the matter of exemption from taxation is not questioned, but "strict construction must be reasonable construction." Y. W. C. A. v. Bauman, 344 Mo. 989, l. c. 902, 130 S. W. (2d) 499, l. c. 501. We think that the construction given Sec. 6, Art. 10, Constitution, in the second and third YMCA cases is too strict, that is, not reasonable. Such construction confines the concept of charity solely to the relief of the destitute, and excludes all humanitarian activities, though rendered at cost or less, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and make it more likely that they will become useful citizens. Prior to the second YMCA case the legal concept of charity, in Missouri, was not confined solely to the relief of the destitute. In the case of In re Rahn's Estate, 316 Mo. 492, l. c. 511, 291 S. W. 120, l. c. 128, the court quoted with approval from 5 R. C. L., Secs. 2, 3, pp. 291, 294, as follows:

"Probably the most comprehensive and carefully drawn definition of a charity that has ever been formulated is that it is a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government. . . . A charity may restrict its admissions to a class of humanity, and still be public; it may be for the blind, the mute, those suffering under special diseases, for the aged, for infants, for women, for men, for different callings or trades by which humanity earns its bread, and as long as the classification is determined by some distinction which involuntarily affects or may affect any of the whole people, although only a small number may

be directly benefited, it is public.'' See also, Robinson et al. v. Crutcher et al., 277 Mo. 1, l. c. 8, 209 S. W. 104; Catron et al. v. Scarritt Collegiate Institute et al., 264 Mo. 713, l. c. 725, 175 S. W. 571, 573. These cases dealt with charitable gifts, but charity is charity and the legal concept of charity expressed and reflected in these cases is, we think, applicable to the present facts. We might say that one ruling in the Crutcher case was, in effect, disapproved in Burrier et al. v. Jones et al., 338 Mo. 679, l. c. 688, 92 S. W. (2d) 885, l. c. 889, but not as to what was said about the meaning of charity.

In YWCA v. Bauman, supra, it was held that the property there concerned was exempt from taxation, but the setup there was, in many respects, different from that in the present case. However, in some instances, charges were made for services rendered in the YWCA case, but it was ruled that such services were (130 S. W. (2d) l. c. 502) ''incident to and a part of both the educational and religious activities of the Association'', and that the charges made did not defeat exemption.

The point that seemed to be most effective in the second and third YMCA cases was on the phrase in the Constitution, ''used exclusively.'' State ex rel. Spillers v. Johnston, 214 Mo. 656, 113 S. W. 1083, was a suit to recover taxes assessed against the Kemper Military School property at Boonville. It was held that the property was exempt. There the phrase mentioned was defined as follows (214 Mo. l. c. 663):

''The phrase 'exclusively used' has reference to the primary and inherent use as over against a mere secondary and incidental use. (People ex rel. v. Lawler, 77 N. Y. Supp., l. c. 842, et seq.). If the incidental use (in this instance (the proprietor and family) residing in the building) does not interrupt the exclusive occupation of the building for school purposes, but dovetails into or rounds out those purposes, then there could fairly be said to be left an exclusive use in the school on which the law lays hold.''

Webster Apartments v. City of New York, 193 N. Y. S. 650, was an action to have certain property declared exempt from taxation. The purpose of the plaintiff was: ''To generally improve the conditions of unmarried working women and particularly to establish, maintain and conduct apartments in the borough of Manhattan, city of New York, for occupation by unmarried working women regardless of their religious belief or nationality and wherein they may find comfortable and attractive homes.'' It was conceded that the plaintiff's purpose was praiseworthy and that the service rendered was beneficial to the working women, but it was contended that the plaintiff must go further and show that the recipients of the service were ''persons in need of assistance and proven objects of charity.'' In answer to such contention the court said:

"To restrict the meaning of the word 'benevolent' as used in the tax law to such a purpose would clearly be contrary to the intent of the legislature and to the public policy of the state, as defined in all the previous decisions of this and other courts. It may well be presumed that the working women who will be received in these apartments will in the main be self-supporting women who would not be willing to be the 'recipients of charity' in the ordinary meaning of that term, yet the state has a distinct interest in the physical as well as the moral well-being of this class of its citizens, and the purpose of providing for them homes and wholesome food at or below cost is not only a purpose which is 'benevolent' in the sense that it appeals to kindly hearts, but is 'benevolent' in the sense that it serves the public welfare."

Plaintiff alleged and the evidence shows that the purpose in establishing the Evangeline Residence was the welfare of girls and women, especially those of lower earning capacity and income, and "to provide them, at a minimum cost to them, and at a price, regardless of cost, within their abilities to pay, with board and lodging and a place of study of a homelike character under wholesome and decent influences and with proper protection and surroundings calculated to inculcate Christian character and develop good citizenship."

State ex rel. Alexian Brothers Hospital v. Powers, 10 Mo. App. 263, was an action in mandamus to compel the city assessor, St. Louis, to strike relator's property from the list of taxable property. The court of appeals said (10 Mo. App. l. c. 268):

"It appears from the pleadings in the present case, that the whole object of the institution is charity; nobody connected with it can derive any profit from the work carried on there (so in the present case); any profit derived from pay patients is applied exclusively to the charitable purposes of the institution; and every part of the building is used exclusively for a hospital. The object being clearly charitable, and exclusively so, and all ideas of private gain, profit, or advantage being excluded, we are unable to see any reason for holding that the purpose is not 'purely charitable' within the meaning of the law."

The Alexian Brothers Hospital case reached the supreme court, 74 Mo. 476, and the ruling of the court of appeals was affirmed. A headnote to the supreme court opinion, derived from the court of appeals opinion, follows: "A hospital building is not excluded from the benefits of a statute exempting from taxation property used for 'purposes purely charitable', merely because certain patients therein pay for what they receive, where it appears that any profit derived therefrom is applied exclusively to the charitable purposes of the institution."

Some criticism was made of the Alexian Brothers Hospital case in State ex rel. Evangelical Lutheran Cemetery Assn. v. Lange, 16 Mo. App. 468, l. c. 472, but the ruling in that case still stands. What is said of the Alexian Brothers Hospital case and the ruling therein is,

we think, applicable to the Evangeline Residence of plaintiff in the present case.

It will be noted that in the second YMCA case (320 Mo. 372) there was cafeteria service to invited friends of members, regardless of need, and transient rates were charged those who occupied a room for less than a week, and perhaps there were other services of a commercial nature. In the third YMCA case (329 Mo. 1007) the setup, services and charges were about the same as in the second, except that the service was confined to members only, and in both, so far as appears, services, rooms, etc. were not limited, as in the present case, to a low income group. But any ruling in the YMCA cases contrary to our ruling in the present case should be and the same is overruled.

The judgment should be reversed and the cause remanded with directions to enter judgment that the June 1, 1942, assessment is void and that the taxes based thereon and due in 1943 are not collectible, and that plaintiff's property described in the petition is not taxable so long as not used for commercial purposes. It is so ordered.

PER CURIAM:—The Divisional Opinion by BRADLEY, C., as modified, is adopted as the opinion of the Court en Banc. All concur.