

# SUPREME COURT OF MISSOURI
## en banc

BEYOND HOUSING, INC. and )        *Opinion issued September 13, 2022*
PAGEDALE TOWN CENTER II, )
                                 )
         Respondents, )
v. )        No. SC99051
                                 )
DIRECTOR OF REVENUE, )
                                 )
         Appellant. )

PETITION FOR REVIEW OF A DECISION OF THE
ADMINISTRATIVE HEARING COMMISSION
The Honorable Sreenivasa Rao Dandamudi, Commissioner

The director of the department of revenue appeals the decision of the administrative hearing commission ("AHC") finding Beyond Housing, Inc., and Pagedale Town Center II, LLC, ("PTC II") qualify for sales and use tax exemptions as charitable organizations pursuant to section 144.030.2(19).[1] The director claims the AHC erred in determining Beyond Housing and PTC II can now qualify as a charitable organization when Beyond Housing was previously granted civic exemptions because the statutory categories of charitable and civic exemptions are mutually exclusive classifications. The director claims the AHC also erred in determining Beyond Housing and PTC II qualify for sales and use

---

[1] All statutory citations to section 144.030 are to RSMo Supp. 2018. All other statutory references are to RSMo 2016.

tax exemptions because its development of the fourth phase of its Pagedale Town Center, what it calls "Phase IV," is not a charitable activity as it benefits the general welfare of the community rather than low-income residents.

This Court finds the AHC did not err in finding Beyond Housing and PTC II qualify for the charitable exemption because the definitions of charitable and civic organizations in section 144.030.2 do not create mutually exclusive categories of exemptions and the organizations' primary purpose in developing Phase IV is to benefit persons with low incomes in a specific area, which is a charitable activity. The AHC's determination that Beyond Housing and PTC II qualify for sales and use tax exemptions as charities is supported by competent and substantial evidence upon the whole record and authorized by law. Therefore, the AHC's decision is affirmed.

**Factual and Procedural Background[2]**

Beyond Housing is a Missouri not-for-profit corporation originally organized for the purpose of encouraging cooperative efforts to combat community deterioration and to secure decent, safe and sanitary housing, community facilities, and other related facilities and services conducive to the progress and general welfare in designated areas of operation. Since its founding, however, Beyond Housing has expanded its mission to provide a wide range of services to meet the needs of persons living within its area of operation.[3]

---

[2] Because neither party contests the AHC's factual findings, portions of this section are taken from the AHC's decision without further attribution.

[3] The director acknowledges Beyond Housing merged with another organization in 2002 and its amended articles of incorporation reflect its expanded mission, stating its purpose is to provide "*direct services* including affordable rental housing, *social services*,

Beyond Housing primarily operates in an area within the Normandy school district in north St. Louis County known as the 24:1 Designated Area (the "24:1 area" or the "area"), so called because the area was originally composed of 24 small municipalities. Residents of the 24:1 communities are predominantly low-income African-Americans who are exposed to higher rates of crime, poverty, chronic unemployment and underemployment, and a lack of educational services.[4] To ameliorate these adverse effects of poverty, Beyond Housing works to improve the quality of life for persons living in the 24:1 area by providing them with services and developing projects not otherwise available to them. Its decisions as to the services it provides and the projects it develops are based on the needs expressed by persons in the area.

One need of persons living in the 24:1 area is for affordable housing and housing services. Accordingly, to serve area residents, a limited partnership Beyond Housing created owns 513 low-rent housing units, including two senior residences with 95 units. Persons living within the 24:1 area, including those who do not rent from Beyond Housing, can obtain rental assistance and utility payment assistance through the organization, which is made possible by philanthropic donations and government grants. Further, eligible families in the 24:1 area and the greater St. Louis area can obtain from Beyond Housing assistance with down payments and closing costs, financial advising services, and home repair loans.

---

homeownership education and other programs, and broad based community building efforts." (Emphasis added).

[4] In 2015, the median household income in the area was about $32,500 as compared with $89,000 in St. Louis County generally.

Persons living in the 24:1 area also need health services. Because they had no primary or urgent care options, Beyond Housing worked to bring to the 24:1 area Affinia Healthcare and BJC Behavioral Health, both of which are non-profit health care organizations. But for Beyond Housing's efforts, neither organization would serve the area. Beyond Housing itself also directly provides health-related services to area residents. It employs two health workers who focus on asthma and diabetes – conditions disproportionately affecting persons in the area. The health workers identify individuals who suffer from asthma or diabetes and connect them with affordable health services.

In keeping with its holistic approach to improving the quality of life for persons living in the area, Beyond Housing also has worked to provide affordable and healthy food options. Prior to Beyond Housing's intervention, the persons living in the area had no access to affordable and healthy food, and the area was known as a "food desert." To provide access to food, Beyond Housing developed a commercial structure that is now leased to Save-A-Lot. The grocery store directly benefits low-income residents with more than 50 percent of its sales made through the federal supplemental food assistance program.

The services Beyond Housing provides to residents of the 24:1 area go beyond housing and health-related services. Because adults and children living in the 24:1 area need educational and social services, Beyond Housing operates the Pagedale Family Support Center, which is open every day and functions as a hub for neighborhood activities, training programs, and other services. At the center, residents have access to a monthly food pantry, a computer lab, job referrals, an after-school program, a summer program, and a sports league. The Normandy School District collaborates with Beyond Housing to

4

transport its students to the center, where Beyond Housing offers children assistance with their homework, hot meals, mentoring, counseling, and family support. Additionally, through its Family Liaisons Program, Beyond Housing staffs 13 individuals in Normandy Public Schools who work to connect families with resources, services, and information concerning educational opportunities. And, every year, Beyond Housing administers a back-to-school drive that provides more than 3,000 children with school supplies.

Beyond Housing also developed a four-screen cinema to provide persons living in the 24:1 area with family entertainment options and job opportunities and to generate tax revenue. Through Beyond Housing's Viking Advantage Program, Normandy high school students work at the local theater, and Beyond Housing matches savings the students set aside to finance college education. So far, the program has had more than 350 participants and 75 college graduates. A dozen of these students have earned advanced degrees. Similarly, Beyond Housing connects residents of the 24:1 area with employment opportunities by collaborating with the City of Wellston to provide job training.

Beyond Housing has also benefitted the residents of the area by demolishing blighted buildings and replacing them with public parks; repairing and improving streets and sidewalks where children walk to school; creating bike paths, tree lines, and benches; and rebuilding roads, parks, and sewer systems.

Beyond Housing is currently undertaking Phase IV of its Pagedale Town Center development. To develop Phase IV, Beyond Housing created PTC II, a single-member Missouri not-for-profit, limited liability company wholly owned by Beyond Housing. Phase IV includes the construction of a 20,000-square-foot, two-story structure. The first

5

floor will be occupied by locally owned restaurant ventures, including a healthy vegan restaurant, a smoothie restaurant, and a traditional American restaurant, as well as a women's clothing store, an African jewelry and accessories store, and a fitness center.

The second floor will be partially occupied by a community kitchen for neighborhood and local-business use that will provide job training for area residents in culinary arts and act as a feeder for employment in one of the restaurants on the first floor. A Beyond Housing affiliate will operate the community kitchen, which, alone, will occupy roughly a quarter of the rentable space in Phase IV. In addition to the community kitchen, the second floor will have expanded offices for BJC Behavioral Health's provision of behavioral health care and Affinia Healthcare's provision of primary health care. Finally, the second floor also includes office space for an entrepreneurial education and training program for minority women artists as well as office space for a workforce development program. Seventy-five percent of the building is leased to nine African-American owned small businesses, and 71 percent is leased to women-owned businesses.

Since the 1990s, Beyond Housing has applied for and received sales and use tax exemptions as a civic organization, and, in 2014, the department of revenue granted Beyond Housing a perpetual exemption as a civic organization. In the process of developing Phase IV in 2019, however, both Beyond Housing and PTC II applied for sales and use tax exemptions as charitable organizations to permit their contractors to qualify for a sales tax exemption pursuant to section 144.062.1(2) for materials purchased to construct

Phase IV.[5]  Unlike Beyond Housing, PTC II has not previously applied for a sales and use tax exemption.

The director denied the organizations' applications for sales and use tax exemptions, finding Beyond Housing failed to meet its burden of establishing it is a charitable organization and PTC II did not qualify as a charitable organization.  Beyond Housing and PTC II appealed to the AHC, pursuant to section 621.050.1, and their appeals were consolidated.  Although the letter denying the exemptions did not state the reasons for the denial, in his answer filed with the AHC, the director stated the applications were denied, in part, because Beyond Housing had previously received exemptions as a civic organization.

The AHC determined both organizations qualify as charitable organizations under section 144.030.2(19) and their activities reflect a charitable purpose.  Accordingly, the AHC granted Beyond Housing and PTC II sales and use tax exemptions as charitable organizations.  The director appealed the AHC's decision to this Court, under section 621.189.  This Court has jurisdiction pursuant to article V, section 3 of the Missouri Constitution.

On appeal, the director raises two claims of error.  First, he claims the AHC erred in determining Beyond Housing and PTC II are charitable organizations because the definitions for civic and charitable organizations in subdivisions (19) and (20) of section 144.030.2 are mutually exclusive and preclude such a determination.  Second, the director

---

[5] The IRS recognizes both Beyond Housing and PTC II as charitable organizations exempt from federal taxation.

7

asserts the AHC erred in determining Beyond Housing and PTC II are entitled to sales and use tax exemptions as charitable organizations, pursuant to section 144.030.2(19), because their Phase IV development is not a charitable activity.

## Standard of Review

This Court will affirm the AHC's decision if: (1) it is authorized by law; (2) it is supported by competent and substantial evidence upon the whole record; (3) mandatory procedural safeguards are not violated; and (4) it is not clearly contrary to the General Assembly's reasonable expectations. Section 621.193. "This Court reviews the AHC's interpretation of revenue laws *de novo.*" *Collison v. Dir. of Revenue*, 621 S.W.3d 165, 166 (Mo. banc 2021). Tax exemptions, moreover, must be "strictly, but reasonably, construed against the party claiming the exemption." *Rollings v. Shipman*, 341 S.W.3d 777, 780 (Mo. App. 2011) (quoting *United Cerebral Palsy Ass'n of Greater Kan. City v. Ross*, 789 S.W.2d 798 (Mo. banc 1990)).

## Charitable and Civic Not Mutually Exclusive

The director's first claims Beyond Housing is not eligible for exemptions as a charitable organization because it has always applied for and received civic exemptions and, in 2014, was granted perpetual exemptions as a civic organization. The director claims the AHC erred in its interpretation of subdivisions (19) and (20) of section 144.030.2 when it determined the definitions of civic and charitable organizations are synonymous. The director contends that interpreting the definitions of civic and charitable organizations to cover the same entities renders parts of section 144.030.2(20) and section 144.062 superfluous, so the definitions must be mutually exclusive. He argues the legislature's

8

intention that the definitions of civic and charitable be mutually exclusive is confirmed by the statutory structure, provisions of section 144.062(2), and a prior decision of this Court. Implicit in his argument is the assumption that, once an organization has applied for and received exemptions under one category, the organization cannot receive an exemption under the other.

This Court reviews questions of statutory interpretation *de novo*. *Gross v. Parson*, 624 S.W.3d 877, 884 (Mo. banc 2021). "The primary goal of statutory interpretation is to give effect to legislative intent, which is most clearly evidenced by the plain text of the statute." *Id.* (quoting *State ex rel. Goldsworthy v. Kanatzar*, 543 S.W.3d 582, 585 (Mo. banc 2018)). Words and phrases must be taken "in their plain or ordinary and usual sense." Section 1.090. And all a statute's words should be given meaning as this Court presumes the legislature did not insert "idle verbiage" or "superfluous language." *Kanatzar*, 543 S.W.3d at 586.

Section 144.030.2 lists, among others, the following exemptions from state sales and use taxes:

> (19) **All sales made by or to religious and charitable organizations and institutions in their religious, charitable or educational functions and activities** and all sales made by or to all elementary and secondary schools operated at public expense in their educational functions and activities[.]
>
> (20) All sales of aircraft to common carriers for storage or for use in interstate commerce and **all sales made by or to not-for-profit civic . . . organizations . . . in their civic or charitable functions and activities** and all sales made to eleemosynary and penal institutions and industries of the state, and all sales made to any private not-for-profit institution of higher education not otherwise excluded pursuant to subdivision (19) of this subsection or any institution of higher education

9

supported by public funds, and all sales made to a state relief agency in the exercise of relief functions and activities[.]

(Emphasis added). Contrary to the director's claims, the AHC did not find the charitable exemption in subdivision (19) and the civic exemption in subdivision (20) of section 144.030.2 are synonymous. Instead, it found the definitions overlap but contain differences.

As the AHC found, there is no language in sections 144.030.2(19)-(20) to show an intention the civic and charitable exemptions be mutually exclusive. Nor does the presumption that the legislature does not use superfluous language support a conclusion that the categories are mutually exclusive based on the mere fact subdivisions (19) and (20) provide separate designations for civic and charitable organizations. Applying the presumption that the legislature does not use superfluous language, separate designations for civic and charitable organizations justify only the conclusion that such categories are not coextensive and there is some difference between the two, which is consistent with this Court's prior decisions articulating the definitions of civic and charitable organizations.

This Court has previously articulated the plain and ordinary meaning of "civic" within the context of section 144.030.2(20):

Forming a component of or connected with the functioning, integration, and development of civilized community (as a town or city) involving the common public activities and interests of the body of citizens . . . concerned with or contributory to general welfare and the betterment of life for the citizenry of a community or enhancement of its facilities; *esp:* devoted to improving health, education, safety, recreation, and morale of the general public through nonpolitical means[.]

10

*Indian Lake Prop. Owners Ass'n, Inc. v. Dir. of Revenue*, 813 S.W.2d 305, 308 (Mo. banc 1991) (alterations in original) (citing WEBSTER'S THIRD NEW INT'L DICTIONARY 412 (1986)).

The definition of "charity" has also been the subject of this Court's prior decisions. In *Salvation Army v. Hoehn*, 188 S.W.2d 826, 830 (Mo. banc 1945), this Court concluded prior cases too narrowly construed the definition of "charity" because the prior construction: "exclude[d] all humanitarian activities, though rendered at cost or less, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and make it more likely that they will become useful citizens." Recognizing humanitarian activities are charitable, this Court rejected the prior construction and articulated a broader definition:

> [Charity] is a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government. A charity may restrict its admissions to a class of humanity, and still be public; it may be for the blind, the mute, those suffering under special diseases, for the aged, for infants, for women, for men, for different callings or trades by which humanity earns its bread, and as long as the classification is determined by some distinction which involuntarily affects or may affect any of the whole people, although only a small number may be directly benefited, it is public.

*Id.* (alteration omitted).

Comparing the definitions of civic and charitable organizations shows the two categories overlap. Many of the activities of a civic organization could be characterized as the humanitarian activities the definition of "charity" in *Salvation Army* was meant to

11

include – namely, those "intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and make it more likely that they will become useful citizens." *Id.* Yet the definitions are not the same, and an organization could qualify as one but not the other. For instance, the legal element of a gift is not required for civic organizations, and a charitable organization may, but need not, be limited to a class of humanity. Because some but not all civic organizations may qualify as charitable organizations and vice versa, the definitions are neither coextensive nor mutually exclusive.

The director also claims the definitions must be mutually exclusive because civic organizations address community needs and are concerned with the "general welfare" or "betterment of life for the citizenry of community," and charitable organizations, in contrast, address a specific condition involuntarily affecting a subset of the community, such as "age, disease, illiteracy, lack of religion."[6] As a consequence, the director avers that, if an organization promotes the general welfare of a community at large, it cannot qualify as a charity but only as a civic organization.

---

[6] Although it was not the basis of any findings or conclusions in the AHC's decision, a department of revenue regulation directly contradicts the director's argument. 12 C.S.R. 10-110.955(2)(B) is a regulation promulgated to clarify which transactions are exempt for each type of organization defined in, among other provisions, subdivisions (19) and (20), and it defines "charitable" as "to benefit the common good and welfare of the people of a community while relieving the government of a financial burden that it would otherwise be required to meet." Further, the department's sales or use tax exemption application form states an organization qualifies for a charitable exemption if it "[b]enefits the common good and welfare of the community, not only within the organization, while relieving government of a financial burden that it would otherwise be required to meet."

Generally, a civic organization is one that intends to benefit the welfare of the general public, in contrast with a charitable organization's intention to improve the lives of individual persons. But civic and charitable organizations significantly overlap in their purposes and activities. After all, subdivision (20) provides sales and use tax exemptions to civic organizations "in their civic *or charitable* functions and activities." Section 144.030.2(20) (emphasis added). Moreover, refusing to recognize that charitable organizations may contribute to the general welfare as a consequence of benefitting individuals within a community ignores the reality of charitable work and would foreclose humanitarian activities "intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and make it more likely that they will become useful citizens." *Salvation Army*, 188 S.W.2d at 830. Therefore, an organization may contribute to the general welfare of a community and qualify as a charitable organization.

The director also alleges language in subdivision (20) of section 144.030.2 indicates civic and charitable organizations are mutually exclusive categories because it exempts "all sales made to any private not-for-profit institution of higher education *not otherwise excluded pursuant to subdivision (19)* of this subsection or any institution of higher education supported by public funds." Section 144.030.2(20) (emphasis added). He argues the fact the legislature intended to made educational entities in subdivision (20) exempt only if not exempt in subdivision (19) means there can be no overlap between any of the categories in subdivisions (19) and (20). The emphasized language may establish exclusivity between private not-for-profit institutions of higher education in subdivision

13

(20) and any overlapping categories in subdivision (19), but there is no similar language establishing exclusivity between any of the other organizations in the two subdivisions. And if it were already the case, as the director assumes, that there is no overlap between categories in the two subdivisions, the emphasized language would be unnecessary. So its presence in subdivision (20), contrary to the director's position, indicates some of the categories in the two subdivisions are not exclusive. Subdivisions (19) and (20) provide exemptions for civic and charitable organizations, not because they are mutually exclusive categories but because they are not coextensive categories.

The director further avers subdivisions (2) and (3) of section 144.062.1 indicate the exemption categories in subdivisions (19) and (20) of section 144.030.2 are mutually exclusive. Subdivisions (2) and (3) of section 144.062.1 exempt:

> [S]ales at retail of tangible personal property and materials for the purpose of constructing, repairing or remodeling facilities for: . . . **Any organization sales to which are exempt from taxation under the provisions of subdivision (19)** of subsection 2 of section 144.030; or . . . **Any institution of higher education supported by public funds or any private not-for-profit institution of higher education, exempt from taxation under subdivision (20)** of subsection 2 of section 144.030[.]

(Emphasis added). The director alleges the effect of these exemptions is to group together the religious, charitable, and educational institutions in subdivisions (19) and (20) and exclude civic, social, service, and fraternal organizations in subdivision (20). He contends, if "subsection [sic] 20 civic or educational entities *entirely overlapped* with subsection [sic] 19 charitable groups, then the exempt entities definition would make no sense." (Emphasis added). Granting it would render statutory language superfluous if subdivision (20) civic or educational entities *entirely* overlap with subdivision (19) charitable groups, it does not

14

necessarily follow that the definitions for civic and charitable organizations must be mutually exclusive. Rather, concluding the definitions significantly overlap but are not coextensive, as the AHC concluded, preserves the definitions of "civic" and "charity" this Court has long applied and avoids rendering any language in subdivisions (2) and (3) of section 144.062.1 superfluous.

Finally, the director asserts this Court's decision in *Missouri State USBC Ass'n v. Director of Revenue*, 250 S.W.3d 362 (Mo. banc 2008), suggested civic and charitable organizations are "distinct and potentially exclusive." His assertion hinges on a footnote wherein, after the Court determined the taxpayer in question was entitled to an exemption as a civic organization, the Court stated it was "not necessary to address Bowling Association's alternative argument that it [is] entitled to a tax exemption under section 144.030.2(19) as a 'charitable organization.'" *Id.* at 365 n.6. The director admits this is not conclusive but "counsels that [a] different analysis applies to charitable organizations." The taxpayer in *Missouri State USBC Ass'n* sought sales and use tax exemptions and made alternative arguments that it qualified under either subdivision (19) or (20). *Id.* When the Court found the taxpayer was entitled to exemptions as a civic organization under subdivision (20), it granted all the relief requested, rendering it unnecessary to address the taxpayer's alternative argument. *Missouri State USBC Ass'n* does not speak to the substantive requirements an organization must meet to qualify as charitable under subdivision (19).

In the end, the plain text of subdivisions (19) and (20) establishes not that charitable and civic organizations are mutually exclusive but only that they should not be interpreted

15

to be coextensive. The AHC did not err in determining the definitions of civic and charitable organizations "do not mean the same thing, and their definitions contain differences," so they are not mutually exclusive definitions precluding a finding Beyond Housing and PTC II are charitable organizations. The director's first point is denied.

**Beyond Housing and PTC II Entitled to Sales and Use Tax Exemptions**

In his second claim of error, the director asserts the AHC erred in determining Beyond Housing and PTC II are entitled to sales and use tax exemptions under section 144.030.2(19) because developing Phase IV is not a charitable activity in that it "contributes to the general welfare rather than indigent people in general"; the organizations do not benefit an indefinite number of persons but rather the community at large; and Phase IV is not a gift.

Section 144.030.2(19) exempts "[a]ll sales made by or to religious and charitable organizations and institutions in their religious, charitable or educational functions and activities." The statute's plain and ordinary language requires an organization to meet two requirements before being entitled to an exemption. An organization must be charitable in nature and the sales for which it seeks tax exemption must be made by or to the organization in its charitable functions and activities. *Id.*

For an organization to be charitable in nature, its purposes and functions must be charitable. *See Indian Lake Prop. Owners*, 813 S.W.2d at 308 (holding an organization is civic in nature if its purposes and functions are civic). As previously discussed, the definitions of charitable and civic overlap. Section 144.030.2(20) expressly provides exemptions for civic organizations in their "civic *or charitable* functions and activities[.]"

16

(Emphasis added). And certain recognized charitable functions also clearly fall within the definition of "civic," including "erecting or maintaining public buildings or works or otherwise lessening the burdens of government." *Salvation Army*, 188 S.W.2d at 830.[7] This prompts the question whether, when an organization's purposes and functions could be characterized as both charitable and civic, the purposes and functions must primarily be one or the other.

There is no language in section 144.030.2, and no case precedent found, requiring an organization's nature be "primarily" charitable versus civic. Nor is there an obvious policy reason to require eligibility for an exemption be so limited. So long as an organization or institution meets the criteria of an exemption in 144.030.2, it is relieved of paying sales and use tax, as it would if it could also meet the criteria of a second exemption. The director's similar arguments seem to be based on a concern that an organization should not receive the benefit of its contractor's purchases being exempt from sales tax pursuant to section 144.062 when the organization is not truly a charity. But that concern is resolved by requiring an organization to present adequate proof of its nature and activities to meet the criteria for a charity under section 144.030.2(19), regardless of whether the

---

[7] This component of the definition of "charity" disposes of the director's assertion that Beyond Housing is not a charity because it assists local governments in carrying out government functions, e.g., repairing sidewalks and roads, and, in some cases, Beyond Housing performs those functions itself.

organization might also meet the criteria for a civic organization under section 144.030.2(20).[8]

In a related context, when an *activity's* purpose is examined, the organization's primary purpose in conducting the activity governs whether the activity qualifies as charitable. *See Dir. of Revenue v. St. John's Reg'l Health Ctr.*, 779 S.W.2d 588, 591 (Mo. banc 1989) (holding an organization's primary purpose in conducting an activity governs whether the activity meets the requirements of the sales and use tax exemption). But prior decisions have not applied the "primary purpose" test to determine an organization's nature when the *organization's* purpose could be classified as either civic or charitable. The requirement of proof of a "primary purpose" for an activity but not an organization's nature seems intentional as a recognition that a civic or charitable organization may undertake different types of activities to further its purpose.

Nevertheless, the parties have not raised or briefed the issue, and the director has, instead, focused his claim of error on classifying Beyond Housing's and PTC II's purposes and functions as civic. He ignores the overlap between the civic and charitable purposes and functions, reflecting his prior claim that subdivisions (19) and (20) create mutually exclusive categories. It is not advisable for this Court to *sua sponte* adjudicate such issue in this case for those reasons and, additionally, because such adjudication would be dicta. Even if it were a requirement that an organization's purposes and functions must be

---

[8] The Court notes the AHC, in previous decisions, has concluded both a civic and charitable sales tax exemption may be granted. *Dierberg Operating Found., Inc. v. Dir. of Revenue*, Case No. 07-0671 RS (Mo. Adm. Hearing Comm'n Feb. 22, 2008); *Mo. Storytelling, Inc. v. Dir. of Revenue*, Case No. 04-0284 RS (Mo. Adm. Hearing Comm'n Mar. 2, 2005).

primarily charitable in order for the organization to be charitable in nature, Beyond Housing's and PTC II's purposes and functions are overwhelmingly charitable.

The AHC so concluded in its finding Beyond Housing and PTC II "primarily exist[] to benefit those people within the 24:1 Area (and elsewhere to a lesser extent) who involuntarily suffer from poverty and its effects . . . . Beyond Housing was founded to address and correct societal ills, and this targeted benevolence overwhelmingly supersedes its general civic functions and profit making."[9] Beyond Housing's purposes and functions have expanded since its founding when it focused almost entirely on developing affordable housing for low-income persons and initially applied for exemptions as a civic organization. It now exists to benefit persons within the 24:1 area who involuntarily suffer from poverty, and it provides a wide range of services beyond housing to do so. Nothing in section 144.030.2 precludes it from applying for and receiving exemptions reflecting its expanded and now predominantly charitable purposes and functions. Because Beyond Housing's and PTC II's purposes and functions are charitable, Beyond Housing and PTC II are charitable organizations.

---

[9] This finding disposes of the director's assertion that Beyond Housing is not a charitable organization because Phase IV does not benefit an "indefinite number of persons." The requirement that charity is a gift for the benefit of "an indefinite number of persons" means it must be for the benefit of "the public at large, or some portion thereof, or upon an indefinite class of persons" as distinct from ascertainable individuals. *In re Rahn's Estate*, 291 S.W. 120, 128 (Mo. 1926); *see Charity*, WEBSTER'S THIRD NEW INT'L DICTIONARY UNABRIDGED 378 (3d. ed. 2002). Because the AHC found Phase IV is meant to benefit "those people within the 24:1 area (and elsewhere to a lesser extent) who involuntarily suffer from poverty and its effects," Phase IV benefits an indefinite number of persons.

19

The director next asserts sales made to Beyond Housing and PTC II in relation to the development of Phase IV are not sales made to the organizations "in their charitable functions and activities," as required by section 144.030.2(19), because developing Phase IV is not a charitable activity. He claims Phase IV is nothing more than a commercial retail shopping center. The facts, however, do not support the director's characterization of Phase IV as a commercial retail shopping center.

As previously described, Phase IV entails the construction of a 20,000-square-foot, two-story structure. The first floor will be leased to locally owned restaurants, including a healthy vegan restaurant, a smoothie restaurant, and a traditional American restaurant. The first-floor tenants will also include a women's clothing store, an African jewelry and accessories store, and a fitness center. The second floor will be leased to a community kitchen for neighborhood and local-business use operated by a Beyond Housing affiliate to provide job training for area residents in culinary arts and act as a feeder for employment in a restaurant on the first floor. The community kitchen occupies roughly a quarter of the rentable space in Phase IV. In addition to the community kitchen, the second floor includes expanded offices for BJC Behavioral Health, which provides behavioral healthcare, and Affinia Healthcare, which provides primary healthcare. The second floor also contains office space for an entrepreneurial education and training program for minority women artists as well as office space for a workforce development program. Seventy-five percent of the building is leased to nine African-American owned small businesses. Seventy-one percent is leased to women-owned businesses.

The businesses Beyond Housing has chosen to occupy the structure developed in Phase IV all serve the needs of persons within the area. The locally owned restaurants further its mission to provide local residents with local food options, particularly healthy food options. Leasing space to the women's clothing store and the African jewelry and accessories store provides low-income persons with needed access to retail shopping within their own community and also promotes small businesses owned by minorities and women. The fitness center serves to benefit the health of persons living within the 24:1 area by promoting exercise and healthy activities. The community kitchen serves obvious charitable aims, as the director readily admits. Expanded offices for BJC and Affinia cement the presence and availability of healthcare, both primary and behavioral, for persons living in the area and are expected to expand the types of health care provided. And office space for an entrepreneurial education and training program for minority women artists and a workforce development program is clearly aimed at directly benefitting disadvantaged persons living in the area.

The director's challenge to the determination that these activities are charitable focuses on the fact Phase IV includes the women's clothing store and the African jewelry and accessories store. While the business owners who operate the retail stores presumably do so to make a profit, Beyond Housing's purpose in including the stores in Phase IV is not to gain a profit. Beyond Housing, through PTC II, will collect rent from its tenants, including the community kitchen, but it sets rent *at or below* market rates. It collects rent sufficient to pay project debt service but not otherwise to generate a profit for Beyond

Housing or PTC II. And any actual operating profit it incidentally gains will be further reinvested in Beyond Housing's charitable efforts.

Similar inclusions of retail operations in otherwise charitable facilities have been determined to be charitable in purpose. In *St. John's Medical Center, Inc. v. Spradling*, 510 S.W.2d 417, 417 (Mo. 1974), hospitals sought a declaration that they were entitled to sales and use taxes as charitable institutions for sales related to the operation of cafeterias and gift shops in their facilities. Though it is not expressly stated, it appears the department of revenue denied the tax exemptions because it construed the cafeterias and gift shops to be commercial businesses operated for profit. *See id.* at 418. This Court found the hospitals' primary purposes in operating the cafeterias and gift shops was not to make profits through competing with commercial enterprise to serve the public. *Id.* at 419. Rather, the Court found the hospitals were entitled to exemptions because their primary purposes in operating the cafeterias and gift shops were to benefit patients by providing them and their visitors with convenient access to necessities and items promoting their comfort and recovery. *Id.*

Likewise, in *St. John's Regional Health Center*, 779 S.W.2d at 588, a hospital that the department of revenue conceded was a charitable organization sought sales and use tax exemptions for a fitness center it operated. The director denied the exemptions because the fitness center was "operated as a commercial for profit activity in competition with other fitness centers." *Id.* at 589. But this Court disagreed and found the hospital operated the fitness center primarily to address "health priorities, including the reduction of cardiovascular disease, health promotion, primary prevention programs that encourage

22

positive life styles, and improving nutritional status." *Id.* It found the fitness center was "an integral part of [the hospital's] comprehensive plan to provide health care on a not for profit basis." *Id.* at 589-90. Summarizing *Spradling*'s holding, the Court held "competition with commercial enterprises, in and of itself, does not deprive an organization of charitable exemption[.]" *Id.* at 591. Rather, an organization's primary purpose in conducting the activity takes "precedence over any purported competition in determining whether the activity me[ets] the requirements of the sales and use tax exemption." *Id.* Ultimately, because the hospital's primary purpose in operating the fitness center was educational, it was entitled to exemptions under section 144.030.2(19) notwithstanding the fact it made a profit. *Id.*

Additionally, *Spradling* and *St. John's Regional Health Center* both relied, in part, on *Missouri Goodwill Industries v. Gruner*, 210 S.W.2d 38, 40-41 (Mo. 1948). In that case, Goodwill obtained a decree enjoining the collector of the city of St. Louis and others from collecting taxes on Goodwill stores in the city of St. Louis. *Id.* at 38. The collector appealed, arguing Goodwill did not use its secondhand stores exclusively for purposes purely charitable because it used its properties in business or commerce. *Id.* at 40. The issue, as the Court defined it, was whether the purposes to which Goodwill devoted its properties were charitable. *Id.* at 39.

The Court noted Goodwill's purpose in operating its stores was to give persons with disabilities "the opportunity, denied them by the harsh competition of the business world, for employment with some remuneration at the start and with the hope of employment in competitive industry after they [we]re trained." *Id.* at 40. It rejected the argument that the

23

use of the properties was not charitable because Goodwill sold the product of its employees' labor, finding Goodwill's primary purpose was not to make a profit but, instead, "to aid the handicapped, and profit, if any, [wa]s incidental." *Id.* at 41.[10]

These cases demonstrate retail operations within a charitable facility may further charitable purposes notwithstanding any incidental profit. The director's characterization of Phase IV as a commercial retail shopping center and Beyond Housing as an ordinary development agency seeking profit for its civic work ignores the fact Beyond Housing is not developing Phase IV or leasing its space to gain a profit. It sets rents at or below market rates in amounts sufficient to pay project debt service but not otherwise to generate a profit. Instead of a motivation to earn a profit, Beyond Housing's and PTC II's purposes in

---

[10] The director relies, instead, on *Sunday School Board of Southern Baptist Convention v. Mitchell*, 658 S.W.2d 1, 6 (Mo. banc 1983), to assert there must be a significant nexus between profits earned through Phase IV and any charitable use made of the profits. *Mitchell*, however, does not counter the conclusion the primary purpose of Phase IV is charitable. In *Mitchell*, the Court held a religious bookstore operated by the Sunday School Board of the Southern Baptist Convention did not qualify for a real property tax exemption because there was not a "significant nexus" between the profits earned through the bookstore and the charitable use made of the profits. *Id.* at 6. Importantly, the test for a property-tax exemption depends on whether the property is "used exclusively . . . for purposes purely charitable," Mo. Const. art. X, sec. 6, and presents a "different issue" than sales and use tax exemptions, *Spradling*, 510 S.W.2d at 418, that have no exclusivity requirement.

Also, in *Mitchell*, unlike the case at bar, the evidence failed to show making a profit was not the bookstore's primary goal or that profits earned were "achieved incidentally" to accomplishing a charitable purpose. 658 S.W.2d at 6. To the contrary, the evidence established the bookstore set competitive prices, did not provide merchandise at or below cost, and used its profits to "defray the general and administrative expenses" of the convention's overall enterprise, aspects of which were not exempt from taxation. *Id.* Consequently, the Court concluded there was no significant nexus between the bookstore's profits and accomplishing a charitable objective. *Id.* The facts at issue in *Mitchell* were vastly different than the case at bar.

24

developing Phase IV are to further their broader charitable purposes of improving the lot of low-income persons living in the 24:1 area through providing them access to, among many other things, resources within their own community. Beyond Housing is, as the AHC concluded, "motivated by a benevolent desire to serve an underprivileged population" and "this targeted benevolence overwhelmingly supersedes its general civic functions and profit making."[11] Because Beyond Housing's and PTC II's primary purpose in developing Phase IV is charitable, Beyond Housing and PTC II are entitled to sales and use tax exemptions for sales made by or to Beyond Housing and PTC II in developing Phase IV.

## No Attorney Fees

While this appeal was pending, Beyond Housing and PTC II filed a motion requesting this Court award attorney fees as damages for a frivolous appeal, pursuant to Rule 84.19, and the Court ordered the motion taken with the case. A frivolous appeal is one that "presents no justiciable question and is so readily recognizable as devoid of merit on the face of the record that there is little prospect for success." *Means v. Sears, Roebuck & Co.*, 550 S.W.2d 780, 789 (Mo. banc 1977). The director's position ultimately was not meritorious, but the appeal was not "so readily recognizable as devoid of merit" as to be frivolous. *Id.* Beyond Housing and PTC II's motion for attorney fees as damages for a frivolous appeal is overruled.

---

[11] The director claims Phase IV fails to meet the requirement that charity be a gift, but the element of gift is satisfied when, as here, the organization's primary purpose in conducting an activity is charitable and profit, if any, is incidental. *Mo. Goodwill Indus.*, 210 S.W.2d at 40.

25

**Conclusion**

The AHC did not err in determining the exemption for charitable organizations in subdivision (19) of section 144.030.2 and the exemption for civic organizations in subdivision (20) of section 144.030.2 are not mutually exclusive.  Neither did it err in determining Beyond Housing and PTC II are entitled to sales and use tax exemptions in relation to developing Phase IV.  The AHC's determinations are authorized by law; therefore, the AHC's decision is affirmed.

_____
PATRICIA BRECKENRIDGE, JUDGE

All concur.

26